**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATSUE ELLIOTT, *et al.,* | Case No. 16-cv-0288-BAS-AGS |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| QF CIRCA 37, LLC, *et al.,* | **[ECF No. 92]** |
| Defendants. | |

Presently before the Court is Defendants Versa CIC, LP and ConAm Management Corporation's ("Defendants") Rule 56 motion for summary judgment or, in the alternative, partial summary judgment. (ECF No. 92.) Plaintiffs Natsue Elliott and Linda Brown have opposed the motion (ECF No. 120) and Defendants have replied (ECF No. 124). The Court previously issued a tentative ruling and set the matter for oral argument. (ECF No. 165.) Having considered oral argument and the parties' briefing, the Court grants in part and denies in part Defendants' motion for summary judgment for the reasons set forth herein.

## I. BACKGROUND

### A. Factual Background

Plaintiff Natsue Elliott is an 89-year old who has Alzheimer's. (ECF No. 4, FAC ¶4-6; ECF No. 120-30 ("Brown Decl.") ¶3.) Plaintiff Linda Brown is Elliott's self-appointed guardian and daughter. (FAC ¶5; Brown Decl. ¶2.) Defendants own and operate the Versa at Civita apartment complex ("Civita"), a senior living community in San Diego, California. (FAC ¶¶8–12; ECF No. 125, Joint Statement of Undisputed Material Facts ("Jt. Stmt.") ¶2.) Elliott executed a lease for a studio apartment at Civita on March 27, 2015 and lived at Civita thereafter. (*Id.* ¶6; Brown Decl. ¶4.) Elliott moved out of Civita in January 2017. (ECF No. 92-7 ("Guion Decl.") ¶9; ECF No. 92-3 ("Kanno Decl.") Ex. 6.)

This case centers on Plaintiffs' requests for reasonable accommodations related to Elliott's disability and Defendants' treatment of Plaintiffs during Elliott's time at Civita. In April 2015, Elliott was diagnosed with Alzheimer's. (Brown Decl. ¶3.) Brown informed Vanessa Castanon, an employee of ConAm, who was the on-site manager at Civita, of this. (Jt. Stmt. ¶4; Brown Decl. ¶3.) In connection with Elliott's disability, Plaintiffs made several requests of Defendants and filed a housing discrimination complaint based on alleged denials of those requests.

#### 1. Emotional Support Animal

In April 2015, Elliott was prescribed an emotional support animal. (Brown Decl. ¶6.) Brown's boyfriend sent an email to Defendants requesting permission for a dog to reside with Elliott on April 27, 2015, along with a physician letter. (ECF No. 120-31 ("Smelser Decl.") ¶2; Brown Decl. ¶3; ECF No. 120-5 Ex. 2 (physician letter); ECF No. 120-6 Ex. 3 (email).) Brown followed up with Castanon about this request on April 28, 2015 and did not hear back. (Brown Decl. ¶6.) Shortly thereafter, the onsite maintenance man, Joe Goodhue, told Elliott she could not have a dog. (*Id.* ¶7.) When Brown asked Castanon about this, Castanon told her Goodhue's statement was false. (*Id.* ¶7.) Brown testified that Castanon "told me it

was fine with a note" and "that it was fine because of the notice." (Brown Dep. 311:3–5, 311:20–312:9.) While Elliott lived at Civita, Brown brought a dog over to the apartment. (Jt. Stmt. ¶19.) Elliott also resided with a dog during her tenancy, including when Brown's son resided with Elliott for several months, during which time he had a dog. (Brown Dep. at 230:2–231:13.) Defendants conditionally approved the email request on December 15, 2015 and provided final written approval on December 28, 2015. (ECF No. 92-2 Ex. 4 at P14; ECF No. 120-22 Ex. 58.)

### 2. Apartment Lockout

On May 24, 2015, Plaintiffs requested that Goodhue unlock Elliott's apartment when Elliott locked herself out. (FAC ¶27; Jt. Stmt. ¶20; Brown Decl. ¶9.) Goodhue refused to unlock the apartment. (Brown Decl. ¶9.) He refused because ConAm policy prohibited after hours lockouts. (ECF No. 92-6 ("Castanon Decl.") ¶¶18–19.) Brown's spare key was not on her but was accessible within driving distance. (Brown Decl. ¶9; Brown Dep. 140:16–23, 243:4–13.) Plaintiffs waited until Elliott's other caregiver came with a spare key. (FAC ¶27.)

### 3. Handicap Parking and Curb Parking

Plaintiffs also allege that on May 4, 2015, Castanon told Brown that Elliott's car could not be in a handicap parking space unless Elliot was the driver. (FAC ¶22.) Castanon allegedly refused to permit Elliott to park in the space. (*Id*.) Brown had not obtained a handicap placard. (Castanon Decl. ¶7.)

After this incident, around May 26, 2015, Elliott fell at the apartment and was hospitalized. (FAC ¶28.) Upon returning from the hospital, Brown parked at the curb next to Elliott's apartment. (*Id.* ¶29.) Both parties dispute whether the curb was marked as a designated fire lane and whether "no parking" signs were in place when Brown attempted to park. (*Contrast* Brown Decl. ¶10 *with* Castanon Decl. ¶6; Brown Dep. at 176:7–9, 176:16–17.) Brown claims that "no parking" signs were dutifully erected after this incident. (Brown Decl. ¶11.) Brown further states that after the

incident, Castanon prohibited her from parking at the curb near Elliott's apartment, repeatedly threatened to tow Brown's car, and stated she did not care Elliott had a disability and was unwilling to make any accommodation. (*Id.* ¶10.)

### 4. Live-in Caregiver and Request for a Larger Unit

Brown secured a live-in caregiver for Elliott. (Brown Decl. ¶6.) On June 25, 2015, Elliott requested a reasonable accommodation to move "to preferably a two bedroom to accommodate caregiver or possible one bedroom." (Jt. Stmt. ¶10; Brown Decl. ¶13.) On July 27, 2015, Defendants approved Elliott "[t]o transfer to the next available 1 or 2 bedroom unit, so long as you qualify for the unit at your option." (Brown Decl. ¶13; Castanon Decl. ¶12, Ex. 6.) However, all two-bedroom units were rented when Civita opened in March 2015 and through the end of 2015. (Castanon Decl. ¶13.) Castanon subsequently offered Elliott two one-bedroom units, but Elliott and Brown declined to accept those first two transfers because they preferred a two bedroom option when it became available. (Jt. Stmt. ¶11; Castanon Decl. ¶13; Brown Decl. ¶14; ECF No. 120-19 Ex. 37 at 3.) Elliott accepted Defendants' third offer of a one-bedroom unit in August 2015. (Castanon Decl. ¶14; Brown Decl. ¶14; ECF No. 120-19 Ex. 37 at 3.) After receiving approval from San Diego Housing Commission ("SDHC") for a live-in caregiver under her Section 8 voucher, Elliott transferred into a one-bedroom unit in September 2015. (Castanon Decl. ¶14, Ex. 7; Brown Decl. ¶14.)

### 5. Parking Requests

At the time that Civita residents moved in, parking spots were not assigned to residents. (Jt. Stmt. ¶3.) At Civita, there were only 124 assignable parking spots on the premises for 150 units, excluding 5 handicap spaces and 2 visitor spaces. (*Id.* ¶7.) Castanon reviewed resident rental applications, including Elliott's application, to determine how to assign spots. (*Id.* ¶8.) Brown requested a parking spot for Elliott's caregivers after Castanon had assigned the spots. (*Id.* ¶9.) On August 3, 2015, Brown requested to know when Elliott would have a spot. (*Id.* ¶16.) Castanon

responded that Elliott was "2nd in line for the next available parking spot."  (*Id.* ¶17.)

### 6. Housing Discrimination Complaint and Subsequent Events

Around October 15, 2015, Brown submitted a discrimination complaint to the California Fair Employment and Housing Commission ("DFEH") on behalf of Elliott.  (Jt. Stmt. ¶1; Brown Decl. ¶17.)  The complaint alleged that Defendants had refused reasonable accommodation requests for a larger unit, an assigned parking space, and an emotional support animal.  (ECF No. 92-2 Ex. 2 at P8.)

On November 2, 2015, within a few weeks of the complaint, Elliott received an assigned parking spot.  (Jt. Stmt. ¶18; Brown Decl. ¶18.)  On that day, Castanon also emailed Brown that Elliott could transfer to the next available two-bedroom unit when a resident vacated.  (Castanon Decl. ¶15.)  Three days later, Castanon advised Brown that a unit would be available in January 2016, with a move-in date of January 4, 2016.  (Jt. Stmt. ¶14; Castanon Decl. ¶16; Brown Decl. ¶19.)

About a month later on December 1, 2015, another resident complained of noise coming from Elliott's apartment.  (Jt. Stmt. ¶12; Guion Decl. ¶3.)  An employee of Defendants, Yolanda Dolezal-Guion, went to the resident's apartment later that day to listen for noise.  (Jt. Stmt. ¶13; Guion Decl. ¶3.)  When she heard no noise, she went to Elliott's apartment, but no one answered the door.  (Guion Decl. ¶3.)  She issued a notice of lease violation to Elliott thereafter.  (*Id.* ¶3, Ex. 1 ("Notice of Lease Violation").)  The single page notice stated "[w]hile we want you to enjoy your apartment we ask you to be courteous and respect the peaceful enjoyment of," and identified no "corrective actions."  Plaintiffs claim they feared eviction based on the notice.  (Brown Decl. ¶21.)

A few days later, Guion told Brown that Elliott was no longer permitted to move to a two-bedroom unit.  (Brown Decl. ¶20.)  Elliott was not eligible for another unit transfer under the terms of her Section 8 voucher unless she could satisfy an exception and receive approval from SDHC for that transfer.  (Guion Decl. ¶¶5–7, Ex. 2; Kanno Decl. Ex. 4.)  After Elliott completed the SDHC paperwork to permit

her to receive approval for a two-bedroom unit by December 28, 2015, she received approval from Defendants and transferred to a two-bedroom unit at Civita on January 5, 2016. (Guion Decl. ¶8; *see also* Brown Decl. ¶14.)

**B.      Procedural History**

On January 14, 2016, the DFEH closed its investigation of Plaintiffs' complaint, finding that Plaintiffs had received the accommodations they requested and there was "insufficient evidence" to show that the accommodations had been denied. (ECF No. 92-2 Ex. 4 at P16.) Plaintiffs brought suit against Defendants in this Court on February 3, 2016, asserting claims under (1) the Fair Housing Act ("FHA"), 42 U.S.C. §§3601 *et seq.*; (2) California's Fair Employment and Housing Act ("FEHA"), CAL. GOV. CODE §§12927 and 12955 *et seq.*; (3) the California Unruh Civil Rights Act ("Unruh Act"), CAL. CIV. CODE §§51 *et seq.*; (4) California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §17204; and (5) common law negligence. (ECF No. 1.) The First Amended Complaint contains identical claims and parties. (ECF No. 4.)

Defendants moved under Rule 12(c) for judgment on the pleadings on April 21, 2017, solely with respect to Plaintiff Brown on the ground that she lacked standing to assert any claims and fell outside the zone of interests under the FHA. (ECF Nos. 46–47.) Defendants subsequently filed the instant motion on October 3, 2017. (ECF No. 92.) Thereafter, the Court ruled on the Rule 12(c) motion, sustaining Brown's standing to assert all claims except for a retaliation claim under the FHA and FEHA and a UCL claim. (ECF No. 126.) The Court now addresses the merits of Defendants' motion for summary judgment.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper on "each claim or defense" "or the part of each claim or defense" on which summary judgment is sought when "there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A

fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court's role at summary judgment "is to isolate and dispose of factually unsupported claims" so that they are "prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *id.* at 327. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The court does not make credibility determinations or weigh conflicting evidence, but instead views the evidence and draws all reasonable inferences in favor of the party opposing the motion. *See Anderson*, 477 U.S. at 255.

The moving party has the initial burden of demonstrating the absence of a genuine factual dispute. *Celotex Corp.*, 477 U.S. at 323. A movant satisfies the initial burden by either affirmatively negating the nonmoving party's claim, or by demonstrating that the nonmoving party is unable to prove an essential element of that claim. *Id.* at 322–33; *Jones v. Williams*, 791 F.3d 1023, 1030 (9th Cir. 2015); *see also* J. Friedenthal, M. Kane, & A. Miller, *Civil Procedure* §9.3, p. 457, n.81 (5th ed. 2015). To meet this burden, a party cites to depositions, affidavits or declarations, interrogatory answers, or other materials in the record. FED. R. CIV. P. 56(c)(1). If the moving party fails to carry its initial burden, the nonmoving party has no obligation to produce evidence in response, and summary judgment will be denied. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160–61 (1970); *Great Haw. Fin. Corp. v. Aiu*, 863 F.2d 617, 619 (9th Cir. 1988) (per curiam).

However, if the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial.

*Celotex*, 477 U.S. at 324; *see also S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982) ("[A] party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda.") (citations omitted).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A "scintilla of evidence" in support of the nonmoving party's position is insufficient, rather "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. 242 at 252.

## III.   EVIDENTIARY ISSUES

The Court first addresses the parties' requests regarding evidence used in support of and in opposition to Defendants' motion for summary judgment. Defendants have requested judicial notice and both parties have lodged evidentiary objections to the evidence cited by the other party.

### A.   Defendants' Request for Judicial Notice

Defendants request judicial notice of six documents pursuant to Rule 201 and 902 of the Federal Rules of Evidence.  (ECF No. 92-2, Request for Judicial Notice ("RFJN").)  The Court grants Defendants' request.

Federal Rule of Evidence 201(b) allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).  Defendants request judicial notice of Natsue Elliott's DFEH Complaint, DFEH's Notice of Case Closure, and DFEH Records.  (RFJN Exs. 2–5.)  These administrative records are properly considered under Rule 201(b).  *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953); *see also United States*

*v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008); *Dornell v. City of San Mateo*, 19 F. Supp. 3d 900, 904 n.3 (N.D. Cal. 2013) (taking judicial notice of DFEH complaint and DFEH right-to-sue letter).  The Court also takes judicial notice of Exhibit 6, a Google map image.  *See, e.g.*, *Kalani v. Starbucks Coffee Co.*, 698 Fed. App'x 883, 886 n.2 (9th Cir. 2017) (taking judicial notice of Google map image); *McCormack v. Hiedeman*, 694 F.3d 1004, 1008 n.1 (9th Cir. 2012); *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012).[1]  Lastly, the Court takes judicial notice of Exhibit 1, the Versa at Civita Project Site Plans, dated February 23, 2015, under Federal Rule of Evidence 902(4), as a certified copy of a public record.

## B.   The Parties' Evidentiary Objections

The parties lodge evidentiary objections to the declarations and exhibits submitted by the other party.  (ECF No. 120-33; ECF No. 124-1.)[2]  "[A] party does not necessarily have to produce evidence in a form that would be admissible at trial" in a motion for summary judgment.  *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001).  Rather, "Rule 56[(c)] requires only that evidence 'would be

---

[1] While the Court takes judicial notice of the existence of the Google map image, it does not take notice of the image as evidence whether "no parking" signs were in place when Plaintiffs allege that Brown attempted to park at the curb near Civita—a key factual dispute between the parties.  *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1160 (C.D. Cal. 2011) (materials "implicat[ing] the key disputed factual allegations at issue in th[e] action . . . are not proper subjects of judicial notice" under Rule 201(b)).

[2] Defendants also move to strike all Plaintiffs' exhibits for non-compliance with Civil Local Rule 5.1(e), which requires exhibits to be paged in consecutive numerical order and show the exhibit number.  (ECF No. 124-1 at 3.)  The Court denies Defendants' request.  While all parties should strive to comply with the Local Rules, the Court will not exact form of over substance to provide Defendants with an evidentiary windfall on summary judgment.  Moreover, the Court is mindful that it previously struck Plaintiffs' initial opposing papers (ECF No. 116) at Defendants' request (ECF No. 114) due to non-compliance with the Local Rules, which required Plaintiffs to refile their opposing papers.

admissible', not that it presently be admissible." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006). Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004)); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (same). The parties raise evidentiary objections that fall short of these principles.

### 1.     Boilerplate Objections and Disguised Merits Briefing

Many of the objections raised, particularly those of Defendants, are "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F.Supp.2d 1023, 1033 (C.D. Cal. 2013). Defendants lodge numerous authentication challenges to Plaintiffs' exhibits, even when Defendants have submitted the same exhibit with their summary judgment motion. These objections are overruled. To give a document foundation, the proponent need only make a showing of authenticity sufficient to allow a reasonable juror to find that the matter in question is what its proponent claims. *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (citing FED. R. EVID. 901(a)). The Court is satisfied that Plaintiffs' exhibits meet this standard.

As to other boilerplate objections from both parties regarding lack of foundation, relevance, hearsay, best evidence rule, and prejudice, "the Court will not scrutinize each objection and give a full analysis of identical objections raised as to each fact." *Stonefire Grill, Inc.*, 987 F. Supp. 2d at 1033. "To the extent that the Court relied on objected-to evidence, it relied only on admissible evidence and, therefore, the objections are overruled." *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010).

In addition to boilerplate objections, many of the parties' particularized objections are merits briefing disguised as an evidentiary objection. Objections to

that effect are overruled because they are not proper. *See, e.g., Redwind v. Western Union, LLC*, No. 3:14-cv-01699-AC, 2016 WL 1732871, at *25 (D. Or. May 2, 2016) ("Evidentiary objections are a procedural vehicle to limit the evidentiary record and exclude inadmissible evidence. They are different from the legal and factual arguments a party presents in memorandum in support of or opposition to a motion for summary judgment.").

### 2. Specific Objections to Plaintiffs' Declarations

Defendants object to all declarations Plaintiffs submitted in opposition to summary judgment on the ground that they do not comply with 28 U.S.C. §1746. (ECF Nos. 120-29 ("Fagan Decl."), 120-30 ("Brown Decl."), 120-31 ("Smelser Decl."), and 120-32 ("First Decl.").) The Court overrules these objections. A party may offer unsworn declarations at the motion for summary judgment stage provided that the declarations comply with the requirements of Section 1746. *See, e.g., Chao v. Westside Drywall, Inc*., Civ. No. 08-6302-AC, 2010 U.S. Dist. LEXIS 48093, at *18 (D. Or. May 13, 2010); *Kesey, LLC v. Francis*, CV. 06-540-AC, 2009 WL 909530, at *6 (D. Or. April 3, 2009). Section 1746 requires that an unsworn declaration executed within the United States include language that "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," as well as the date on which the declaration was executed. 28 U.S.C. §1746. Here, each respective declarant states that, "I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct." (Brown Decl. at 9; Fagan Decl. at 2; First Decl. at 2; Smelser Decl. at 2.) This language is substantially similar and therefore satisfies Section 1746. *See Kesey, LLC*, 2009 WL 909530, at *6. With all objections overruled, the Court turns to the merits of the motion.

### IV. FHA AND FEHA CLAIMS

The FAC states claims under the FHA and FEHA based on (1) refusals of Plaintiffs' requests for reasonable accommodations; (2) disparate treatment on the

basis of race, national origin, and disability; (3) discriminatory statements; and (4) retaliation on account of the exercise of fair housing rights. Defendants move for summary judgment on these claims. The Court addresses each set of claims.[3]

## A. Section 3604(f)(3)(B) Reasonable Accommodation Claims

Plaintiffs assert reasonable accommodation claims based on requests for: (1) entry into Elliott's locked apartment, (2) an emotional support animal, (3) transfer into a larger apartment to allow Elliott a live-in caregiver, and (4) parking. The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . ." 42 U.S.C. §3604(f)(2). Under the FHA, "[d]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B). The FHA thus specifically prohibits the refusal of a reasonable accommodation as a form of discrimination based on disability.

To make out a *prima facie* case of a refusal to make a reasonable accommodation, a plaintiff must plead and prove that: (1) he or she suffers from a "handicap" as defined in 42 U.S.C. §3602(h); (2) the defendant knew of the handicap or should reasonably be expected to know of it; (3) the accommodation of the handicap "may be necessary" to afford the plaintiff an equal opportunity to use and enjoy the dwelling; and (4) the defendant refused to make the accommodation.

---

[3] The Court limits its written analysis to Plaintiffs' FHA claims because the disposition of those claims applies equally to Plaintiffs' FEHA claims. *See Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1248 (E.D. Cal. 2009) ("California courts rely on federal housing discrimination law to interpret analogous provisions of FEHA . . . Therefore, violations of the [FHA] will also constitute violations of the parallel provisions of FEHA."); *S. Cal. Hous. Rights Ctr. v. Ass'n & Los Feliz Towers Homeowners Ass'n Bd. of Dirs*., 426 F. Supp. 2d 1061, 1068 (C.D. Cal. 2005) ("[A]nalysis under FEHA mirrors the analysis under the federal Fair Housing Act.").

*DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 1267 (2007); *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997). Under the FHA, "[t]he reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination." *Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d at 1380; *Freeland v. Sisao LLC*, No. 07-CV-3741, 2008 WL 906746, at *3 (E.D.N.Y. Apr. 1, 2008) (same). Defendants do not dispute that Elliott, who has Alzheimer's, is disabled within the meaning of Section 3602(h).[4] Nor do Defendants dispute knowledge of Elliott's disability. For the purposes of its analysis, the Court assumes, as Defendants implicitly do, that Elliott satisfies the first and second requirements of a *prima facie* accommodation claim under Section 3604(f)(3)(B). Defendants' summary judgment challenges center on whether they refused Plaintiffs' requests.

### 1. Request for Entry into Elliott's Locked Apartment

Plaintiffs allege that Defendants' onsite maintenance man, Goodhue, refused to open Elliott's locked apartment on May 24, 2015 after Brown and Elliott's caregiver asked. (FAC ¶27.) Defendants contend that Elliott locked herself out of her apartment, Brown had a spare key to Elliott's apartment, and Goodhue was not authorized to do a lockout pursuant to company policy prohibiting after hours lockouts. (ECF No. 92 at 4–5.) Plaintiffs assert that the lockout request was an accommodation request related to Elliott's disability and, thus, Defendants' refusal violated the FHA. (ECF No. 120.) The Court finds that Defendants are entitled to summary judgment on this claim.

---

[4] Section 3602(h) of the FHA defines the term "handicap" to mean "with respect to a person (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment" except as to "current, illegal use of or addiction to a controlled substance (as defined in section 802 of title 21)." 42 U.S.C. §3602(h). "Persons with Alzheimer's Disease are handicapped within the meaning of the Fair Housing Act." *Groome Res., Ltd., L.L.C. v. Parish of Jefferson*, 52 F. Supp. 2d 721, 723 (E.D. La. 1999).

Plaintiffs have failed to produce evidence showing that Defendants knew that the request for entry into Elliott's locked apartment was a request for a reasonable accommodation. "[T]he duty to make a reasonable accommodation does not simply spring from that the fact that a handicapped person wants such an accommodation made." *Prindable v. Ass'n of Apt. Owners*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003). Rather, a housing provider must have had a prior "opportunity to accommodate." *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012). To have that opportunity, "[t]he defendants must have had an idea of what accommodation [the plaintiff] sought prior to their incurring liability for" refusing it. *Id.*; *Prindable*, 304 F. Supp. 2d at 1258 ("Defendants must instead have been given an opportunity to make a final decision with respect to Plaintiffs' request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law."). Like the ADA, the FHA "does not require clairvoyance" on the part of the defendant that a request is one for a reasonable accommodation. *Burgess v. Hous. Auth. of Alameda Cty.*, No. C01-04098 MJJ, 2006 WL 7347315, at *5 (N.D. Cal. Dec. 30, 2006) (quoting *Walsted v. Woodbury Cty.*, 113 F. Supp. 2d 1318, 1335 (N.D. Iowa 2000)).

An *actual request* by the plaintiff is thus a necessary element of a *prima facie* reasonable accommodation under the FHA. *Moore v. Equity Residential Mgmt., LLC*, No. 16-cv-07204-MEJ, 2017 WL 897391, at *5 (N.D. Cal. Mar. 7, 2017); *see also Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 67 (1st Cir. 2010) (the "claimant must show that he requested a particular accommodation"). To satisfy this element, a plaintiff may expressly request an accommodation from the housing provider or declare that she is entitled to one under the law. *See, e.g., Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 821 F.3d 92, 98 (1st Cir. 2016) (resident requested an accommodation by providing a doctor's note and advising housing provider "that he planned to keep his emotional

support dog in his condominium unit and that he was entitled to do so under federal law"). But a plaintiff need not use the "magic words" of "reasonable accommodation" or the "Fair Housing Act" to trigger a defendant's duty to provide an accommodation so long as the plaintiff's request contains sufficient information to place a defendant on notice that the request is one for a reasonable accommodation. *See Sackman v. Balfour Beatty Cmtys., LLC*, CV 113-066, 2014 WL 4415938, at *7 (S.D. Ga. Sept. 8, 2014); *cf. Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (plaintiff may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation" to convey a request for reasonable accommodation under the ADA).[5] However, "[a] routine or 'mundane' request . . . does not rise to the level of a request for a reasonable accommodation unless the plaintiff specifically explains 'how the accommodation is linked to some disability.'" *Colon-Jimenez v. GR Mgmt. Corp.*, 218 Fed. App'x 2, 3 (1st Cir. 2007) (citing *Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254, 260 (1st Cir. 2001)).

Here, unlike Elliott's accommodation requests for an emotional support animal and transfer to a different unit which expressly included information about her disability, there is no evidence showing that Brown requested that Defendants unlock Elliott's apartment as an accommodation for Elliott's disability. (Jt. Stmt. ¶20; Brown Decl. ¶9.) There is also no evidence showing that Plaintiffs otherwise provided sufficient information at the time they requested entry from which Defendants could conclude that the request was one for an accommodation. (*Id.*) Rather, the record shows that Plaintiffs' request was nothing more than a "mundane" lockout request to a housing provider. *See Colon-Jimenez*, 218 Fed. App'x at 3 (request to move to a different apartment because of "noisy neighbors" was not

---

[5] In the context of an FHA reasonable accommodation claim, courts may look to case law interpreting the ADA's reasonable accommodation requirement for guidance. *See Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1149 (9th Cir. 2003).

sufficiently "direct and specific" to constitute a reasonable accommodation request); *Rise, Inc. v. Malheur Cty.*, No. 2:10-cv-00686-SU, 2012 WL 1085501, at *13–14 (D. Or. Feb. 13, 2012) (recommending summary judgment when there was no evidence plaintiff's permit use request was requested as a reasonable accommodation), *adopted by Rise, Inc.*, 2012 WL 1079808 (D. Or. Mar. 30, 2012). Defendants' duty under the FHA to provide an accommodation was never triggered.

Even if Plaintiffs had sufficiently requested an accommodation, Plaintiffs have failed to produce evidence showing that unlocking Elliott's apartment was "necessary." The FHA requires that an accommodation be "necessary to afford . . . equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B). The FHA links the term "necessary" to the goal of providing "equal opportunity." *See Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 924 (10th Cir. 2012). The Ninth Circuit has interpreted this to "mean that a plaintiff 'must show that, *but for the accommodation*, they likely will be denied an equal opportunity to enjoy the housing of their choice.'" *Cal. Mobile Home Park Mgmt. Co*., 107 F.3d at 1380 (quoting *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996)) (emphasis added). The "necessity" element is thus a causation inquiry into whether the accommodation would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person. *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014); *Wis. Cmty. Servs. v. City of Milwaukee,* 465 F.3d 737, 749 (7th Cir. 2006); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 460 (3d Cir. 2002) ("[I]f the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary." (internal quotation marks and citations omitted)). "[W]ithout a causal link between defendants' policy and the plaintiff's injury, there can be no obligation on the part of the defendants to make a reasonable accommodation." *Cal. Mobile Home Park Mgmt. Co*., 107 F.3d at 1380. In turn, "[t]he 'equal opportunity' element of the FHA

limits the accommodation duty so that not every rule that creates a general inconvenience or expense to the disabled needs to be modified.  Instead, the FHA requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled . . ." *Wis. Cmty. Servs.*, 465 F.3d at 749; *see also Hollis*, 760 F.3d at 541; *Prindable*, 304 F. Supp. 2d at 1256.

Here, although Defendants' conduct may have been an inconvenience, there is no evidence showing that unlocking Elliott's apartment was "necessary" to afford her equal use of her apartment on equal terms with non-disabled tenants.  Brown, who made the request, had a spare key to Elliott's apartment accessible within driving distance. (Brown Dep. 140:16–23, 243:4–13.)  Brown testified that she "was just trying to get into my mom's apartment the quickest way I could." (*Id.* at 243:23–25.)  The evidence also shows that Elliott accessed her apartment and continued to live there after the incident.[6]  Under these circumstances, no reasonable juror could find that Defendants' unlocking of Elliott's apartment was necessary to afford her equal use of her apartment.  *See Budnick v. Town of Carefree*, 518 F.3d 1109 (9th Cir. 2008) (affirming summary judgment when plaintiff "has not set forth sufficient evidence to establish that the RAC's amenities were necessary to house disabled seniors; in other words, that 'but for the accommodation, [the disabled] will likely be denied an equal opportunity to enjoy the housing of their choice.'"); *Howard v. City of Beavercreek*, 108 F. Supp. 2d 866, 873 (S.D. Ohio 2000) (requested accommodation was not necessary when plaintiff continued to live in his home without the accommodation); *cf. Roman v. Jefferson*, 495 Fed. App'x 804, 805 (9th Cir. 2012) (affirming dismissal of reasonable accommodation claim because plaintiff failed to show that a waiver of a $75 monthly storage fee "was necessary for Appellant's use and enjoyment of his . . . apartment, rather than for his live-in

---

[6] Plaintiffs allege in the FAC that "they had to wait for Ms. Elliott's other care giver to bring her a key to get into her apartment."  (FAC ¶27.)

caretaker's convenience"). Accordingly, the Court grants summary judgment to Defendants on this claim.

### 2. Request for Emotional Support Animal

A reasonable accommodation under the FHA may include the use of an emotional support animal in one's home despite a housing provider's rule, policy or law prohibiting animals. *See, e.g., Castillo Condo. Ass'n*, 821 F.3d at 100; *Anderson v. City of Blue Ash*, 798 F.3d 338, 363 (6th Cir. 2015); *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc*., 765 F.3d 1277, 1289 (11th Cir. 2014). Plaintiffs allege that Castanon refused Elliott's request to permit an emotional support animal to reside with her. (FAC ¶¶19–20.) Defendants assert that Elliott received permission to have an emotional support animal and Elliott resided with a dog at Civita. (ECF No. 92 at 13.) The Court concludes that Defendants are entitled to summary judgment on this claim.

Under the FHA, a refusal "occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." *Groome Res. Ltd. L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000); *Bryant Woods Inn, Inc. v. Howard Cty.*, 124 F.3d 597, 602 (4th Cir. 1997) ("[A] violation [of the FHA] occurs when the disabled resident is first denied a reasonable accommodation. . . ."). Whether there has been a "refusal" depends on the circumstances. *Revock v. Cowpet Bay West Condominium Ass'n.*, 853 F.3d 96, 110 (3d Cir. 2017). A refusal may be "actual or constructive." *Groome Res. Ltd. L.L.C*, 234 F.3d at 199; *accord Austin v. Town of Farmington*, 826 F.3d 622, 629 (2d Cir. 2016); *Bhogaita*, 765 F.3d at 1286. Courts have found an actual refusal of a reasonable accommodation for an emotional support animal when the defendant declares that the plaintiff violated a rule prohibiting animals, imposes fines on the plaintiff, gives notice of termination of tenancy to the plaintiff based on a rule violation, or requires the plaintiff to remove the animal or vacate the premises. *See Revock*, 853 F.3d at 111 ( "[a]s a matter of law" the condominium association "may

have refused a reasonable accommodation by declaring [the plaintiffs] in violation of the 'no dogs' rule, by fining them fifty dollars per day or through undue delay"); *Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 806 (E.D. Cal. 2016) (refusal for emotional support animal occurred, in part, when defendant gave notice of termination of tenancy based on violation of the no-pet policy); *Smith v. Powdrill*, No. CV 12-06388 DDP RZX, 2013 WL 5786586, at *6 (C.D. Cal. Oct. 28, 2013) (actionable refusal when defendants responded to request for an exception to the no-pet rule with a 3-Day Notice to Perform Conditions or Covenants or Quit, requiring plaintiff to remove the dog or vacate the premises).

Here, the evidence shows that on April 27, 2015, Brown's boyfriend sent Defendants an email with a reasonable accommodation request for Elliott to have an emotional support animal. (Smelser Decl. ¶2; Brown Decl. ¶3; ECF No. 120-5 Ex. 2 (physician letter); ECF No. 120-6 Ex. 3 (email).) The request contained a letter from Elliott's physician, which prescribed Elliott an emotional support animal. (Ex. 2.) Brown emailed Castanon the following day regarding whether Castanon received the letter. (Brown Decl. ¶6.) She did not receive a response. Shortly thereafter, the onsite maintenance man, Goodhue, told Elliott that the dog she had in her apartment was not permitted to be there. (Brown Decl. ¶7.) Brown spoke with Castanon after the incident, who informed Brown that Goodhue's statement was incorrect. (Brown Decl. ¶7.) [7] Brown testified that, with respect to Elliott having a dog, Castanon "told

_____

[7] In opposition to summary judgment, Brown contends that even after this statement, "Castanon reversed fields again, stating (through the maintenance man again) that my mother could not have an emotional support animal in her apartment." (Brown Decl. ¶3.) There are no facts, however, showing that Castanon acted through the maintenance man. Conclusory speculative statements, like Brown's statements here, are insufficient to create a triable issue of fact. *See, e.g., Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989) (conclusory and self-serving statement in an affidavit is an insufficient basis to establish a genuine issue of material fact); *Bailey v. Suey*, No. 2:12-CV-1954 JCM (CWH), 2018 WL 386149, at *6 (D. Nev. Jan. 11, 2018) ("An uncorroborated and self-interested declaration cannot alone create a dispute as to material fact sufficient to withstand a summary

– 19 –

me it was fine with a note" and "it was fine because of the notice." (Brown Dep. 311:3–5, 311:20–312:9.) Although Defendants had not responded to the written request at this point, this evidence does not show an actual denial of Elliott's request for an emotional support animal.

Defendants conditionally approved the written request on December 15, 2015 and provided final written approval by email on December 28, 2015. (ECF No. 92-2 Ex. 4 at P14; ECF No. 120-22 Ex. 58.) Plaintiffs acknowledge receipt of written approval. But they contend that summary judgment should be denied because there is a triable issue whether Defendants constructively denied Elliott's request through undue delay in providing the written response. (ECF No. 120 at 15.) The law does not support this position based on the evidence here.

The determination of whether a request was constructively denied is fact-specific, and made on a case-by-case basis. *Brooks v. Seattle Hous. Auth.*, No. C12-0878-JCC, 2015 WL 3407415, at *5 (W.D. Wash. May 26, 2015). An undue delay or unreasonable delay in granting a request may amount to a constructive denial. *Bhogaita*, 765 F.3d at 1286; *Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed. App'x 617 622 (6th Cir. 2011) ("injury may result when a housing provider unreasonably delays responding to a request for an accommodation and . . . such a delay may amount to a denial"); *Astralis Condo. Ass'n*, 620 F.3d at 69; *Prindable,* 304 F. Supp. 2d at 1258 ("The denial can be either actual or constructive, 'as an indeterminate delay has the same effect as an outright denial.'"), *aff'd sub nom, DuBois*, 453 F.3d 1175. But delay alone is not sufficient. "[C]ourts . . . consider whether the delay was caused by the defendant's unreasonableness, unwillingness to the grant the requested accommodation, or bad faith, as opposed to mere bureaucratic incompetent or other comparatively benign reasons." *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 257 (S.D.N.Y. 2014). Thus, a plaintiff must provide evidence showing that the delay

judgment motion.").

was for something other than benign reasons and harmed the plaintiff.

Courts have found no refusal of a request for an emotional support animal despite a delay in providing a final response when the plaintiff was never punished for the animal's presence or was provided a temporary exemption from a no-pets rule while the defendant investigated the basis for the request. *Compare Overlook Mut. Homes, Inc.*, 415 Fed. App'x at 623 (no refusal when plaintiff were never "punished" for the companion dog's presence, noting in particular that landlord never began eviction proceeding) *and Dubois*, 453 F.3d 1175 at 1179 (no refusal where plaintiffs were granted a temporary exemption and dog remained present) *with Boffoli v. Swalko*, No. 3:16-cv-01463-YY, 2018 WL 1701884, at *4 (D. Or. Jan. 22, 2018) (defendant never responded to written request for emotional support animal and instead served an eviction notice on plaintiff).

Here, the parties do not dispute that Brown brought a dog to Civita while Elliott lived there. (Jt. Stmt. ¶19.) A dog resided with Elliott at Civita, including when Brown's son resided with Elliott for several months, during which time he had a dog. (Brown Dep. at 230:2–231:13.) Plaintiffs have provided no evidence that Defendants punished Elliott for the presence of the dog or that Elliott did not enjoy the company of a dog. Given the record, no reasonable juror could conclude that Defendants' delay in providing a formal written response constituted a constructive denial. *See Dubois*, 453 F.3d at 1179; *Walters v. Cowpet Bay W. Condo. Ass'n*, No. 2012-24; Civil No. 2012-25, 2014 WL 6478104 (D.V.I. Nov. 19, 2014) (granting summary judgment when, despite delay in response by condominium association, plaintiff was never evicted or threatened with eviction for having a dog). Defendants are entitled to summary judgment on this claim.

### 3. Request to Transfer to Larger Apartment for a Live-in Caregiver

A reasonable accommodation under the FHA may include accommodating a disabled plaintiff's request to transfer to another unit in an apartment building. *See,*

*e.g., Logan*, 57 F. Supp. 3d at 256 (finding that a defendant's failure to accommodate a mobility-impaired plaintiff's request to locate from an upper-floor to a lower-floor apartment was within FHA's reasonable accommodation requirement); *Roseborough v. Cottenwood Apartments*, No. 94 C 3708, 1994 WL 695516 (N.D. Ill. Dec. 9, 1994) (plaintiff confined to a wheelchair for four months after moving into third floor apartment could base FHA claim on defendant's failure to permit her to move to lower floor). Plaintiffs allege that Defendants refused Elliott's request for a larger apartment as a reasonable accommodation necessary for a caregiver to reside with Elliott at Civita. Defendants move for summary judgment on the ground that they did not refuse the request. The Court concludes that Defendants are entitled to summary judgment on this claim.

The evidence show that Defendants approved Elliott's request to transfer to a larger unit. On June 25, 2015, Elliott submitted to Defendants a written reasonable accommodation request to permit her to transfer to "preferable a two bedroom to accommodate a caregiver or possible one-bedroom studio too small." (Jt. Stmt. ¶10; Castanon Decl. Ex. 5.) Defendants approved Elliott "[t]o transfer to the next available 1 or 2 bedroom unit, so long as you qualify for the unit at your option . . ." (Castanon Decl. Ex. 6.) The approval noted that "if you choose to transfer and unit is not presently available, you will be put on a transfer unit." (*Id.*) Defendants subsequently offered Elliott two one-bedroom units that became available, which she declined in order to wait for a two-bedroom unit to become available. (Jt. Smt. ¶11; Castanon Decl. ¶13; Brown Decl. ¶14; ECF No. 120-19 Ex. 37 at 3.) In August 2015, Elliott accepted Defendants' third offer of another one-bedroom unit that became available. (Castanon Decl. ¶14; Brown Decl. ¶14; ECF No. 120-19 Ex. 37 at 3.) Because Elliott's housing at Civita was subsidized by Section 8, she was also required to receive approval from the San Diego Housing Commission ("SDHC") for a live-in caregiver and a corresponding increase in the number of bedrooms permissible under her voucher. Elliott received approval for an increase by one bedroom on

September 10, 2015. (Castanon Decl. Ex. 7.) Elliott transferred into a one-bedroom unit in September 2015. (Castanon Decl. ¶14; Brown Decl. ¶14.)

Plaintiffs contend that the one-month delay between Elliott's request and receipt of Defendants' written approval raises a triable issue regarding constructive denial. This contention fails as a matter of law. "The FHA does not demand that housing providers immediately grant all requests for accommodation." *Bhogaita*, 765 F.3d at 1285–86. The evidence here does not show that the one-month delay was unreasonable or undue. *Compare Astralis*, 620 F.3d at 68–69 (condominium associations' one-year delay in granting a request for handicapped parking spaces constituted denial) *and Groome Res. Ltd.*, 234 F.3d at 197 (ninety-five delay in parish's decision on a group home's application for zoning variance constituted a denial when plaintiff's ability to close on house depended on obtaining variance) *with Taylor v. The Hous. Auth. of New Haven*, 267 F.R.D. 36, 70 (D. Conn. 2010) (two-month delay was insufficient to show constructive denial) *and Logan*, 57 F. Supp. 3d at 273 (granting summary judgment when defendant satisfied reasonable accommodation request and there was no evidence of constructive denial in the two-month period between when request was made and when defendants responded).

Plaintiffs also contend there is a triable issue regarding whether Defendants refused the request because Defendants "attempted to place [Elliott] into many undesirable one-bedroom units, including units in which a tenant had just died and units where there were known trouble makers living above or below the offered one-bedroom unit." (ECF No. 120 at 13.) This argument fails. Although a defendant may be required to make a reasonable accommodation, "it does not have to provide a disabled individual with . . . the accommodation of his choice." *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d. Cir. 2012); *Weiss v. 2100 Condo. Ass'n*, 941 F. Supp. 2d 1337, 1344 (S.D. Fla. 2013) (granting summary judgment on accommodation claim when defendant offered a reasonable accommodation, even if plaintiffs preferred a different accommodation). Consistent with Elliott's written

request, Defendants offered Elliott multiple one-bedroom units. Brown's or Elliott's preference for a more "desirable" unit does not transform Defendants' conduct into a violation of the FHA.

Defendants have also shown that they did not refuse Elliott's reasonable accommodation request to the extent Elliott sought to transfer to a two-bedroom unit because no units were available when Elliott submitted her request. Before a defendant may incur liability under the FHA for failure to provide an accommodation, provision of the accommodation must be possible. *See Stein v. Creekside Seniors, L.P.*, No. 1:13-CV-00481-EJL, 2016 WL 912176, at *10 (D. Idaho Mar. 4, 2016), *aff'd*, 698 Fed. App'x 444 (9th Cir. 2017) (citing *Morgan v. Fairway Nine II Condo. Ass'n*, No. 1:13-CV-00481-EJL, 2015 WL 1321505, at *5–6 (D. Idaho Mar. 24, 2015)). All two-bedroom units at Civita were rented when Civita opened in March 2015 and through the end of 2015. (Castanon Decl. ¶13.) Plaintiffs provide no evidence disputing the lack of available two-bedroom units. The lack of available two-bedroom units defeats the conclusion that Defendants denied Elliott's request. *See Evans v. ForKids, Inc.*, No. 2:17-cv-0153, 2018 WL 524868, at *8 (E.D. Va. Jan. 23, 2018) (granting summary judgment on reasonable accommodation claim when defendant showed that no units were available to satisfy plaintiff's transfer request).

Even with the lack of available units, Defendants engaged in an interactive process to fulfill Plaintiff's request for a transfer to a two-bedroom unit. Specifically, on November 2, 2015, Defendants informed Brown by email that Elliott could transfer to the next available two-bedroom unit when a resident vacated. (Castanon Decl. ¶15.) Three days later, Defendants contacted Brown to advise her that a unit would be available in January 2016 with a move-in date of January 4, 2016.[8] (Jt.

---

[8] Plaintiffs contend that Castanon's representation was untruthful on the ground that another two-bedroom unit was available and given to another resident, resident D.W., "who had asked for it that day." (ECF No. 120 at 9 (citing ECF No.

Stmt. ¶14; Castanon Decl. ¶16; ECF No. 120-18 Ex. 35.) Defendants' reasonable accommodation requests log slated Elliott for a January 5, 2016 move-in. (ECF No. 120-19 Ex. G.)

Plaintiffs argue that a triable issue regarding whether Defendants refused Elliott's request to move to two-bedroom unit remains. They argue that on December 2, 2015, an employee of Defendants, Yolanda Dolezal-Guion, told Brown that Elliott was no longer permitted to move to a two-bedroom unit. (ECF No. 120 at 13; Brown Decl. ¶20.). Defendants have shown that it was not possible for them to provide final approval of Elliott's request for a two-bedroom apartment. Specifically, Elliott was not eligible for another unit transfer under the terms of her Section 8 voucher *unless* she could satisfy an exception and receive approval from SDHC for that transfer. (Guion Decl. ¶¶6–7, Ex. 2; ECF No. 120-20 Ex. 42.) Brown was informed about Elliott's ineligibility on December 3, 2015 when Guion contacted the SDHC after the encounter with Brown, and the SDHC subsequently told Brown how Elliott could satisfy the exception. (Kanno Decl. Ex. 4.)[9] After Elliott completed the SDHC paperwork to permit her to receive approval for a two-bedroom unit by December 28, 2015, she received approval from Defendants and transferred to a two-bedroom unit at Civita on January 5, 2016. (Guion Decl. ¶8; Brown Decl. ¶14; ECF No. 120-

---

120-19 Ex. G).) Plaintiffs' contention stems from a misreading of Civita's log of reasonable accommodation requests from residents and corresponding notes indicating whether and when a request was fulfilled. (ECF No. 120-19 Ex. G at 52.) The log states only the nature of D.W.'s request. Unlike the request for Elliott, which indicates that Elliott was "moving on 1/5/16," the log makes no indication of when D.W.'s request would be fulfilled. (*Id.*) Plaintiffs' misreading is insufficient to raise a triable issue.

[9] An SDHC employee specifically told Brown on December 3, 2015 that "[u]nfortunately since Natsue has moved within the last 12 months, she is not eligible for a move at this time. In the section 8 program you can only move one time in a 12 month period. If you would like to request a reasonable accommodation to our move policy, please send me this request and I will provide you with the form that would need to be completed . . ." (Kanno Decl. Ex. 4.)

22 Ex. 58.)  No reasonable juror could conclude from this evidence that Defendants denied Elliott's request to transfer to a two-bedroom unit.  Rather, the evidence shows that Defendants engaged in an interactive process with Brown resulting in Elliott obtaining SDHC approval and transferring into a two-bedroom unit at Civita.[10]  *See Doe v. Hous. Auth. of Portland*, No. 3:13-cv-1974-SI, 2015 WL 758991, at *8 (D. Or. Feb. 23, 2015) (concluding that defendants engaged in an interactive process with plaintiff over several months, including by granting extensions, complying with plaintiff's request, and responded to plaintiff's communications).  Accordingly, the Court grants summary judgment to Defendants on this claim.

### 4.  Parking Requests

Plaintiffs allege that Defendants denied various types of parking requests in violation of Section 3604(f)(3)(B), including: (1) an assigned parking spot, (2) parking at the curb near Elliott's apartment, and (3) a handicap parking space. Defendants move for summary judgment on all parking request claims.

### a.  Request for An Assigned Parking Spot

The FAC alleges that Brown requested an assigned parking space for her mother in April 2015.  (FAC ¶21.) Brown contacted Castanon again in early August

---

[10] There is a split among courts about whether the FHA requires housing providers to engage in an interactive process.  *See Rodriguez v. Morgan*, No. CV 09-8939-GW(CWx), 2012 WL 253867, at *8 (C.D. Cal. Jan. 26, 2012) (acknowledging split); *compare Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996) ("if a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue.") *with Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1047 (6th Cir. 2001) ("[W]hile some courts have imposed an obligation on employers and employees to engage in an interactive process, there is no such language in the Fair Housing Act . . . that would impose such a duty on landlords and tenants.").  The Court believes that even if the FHA imposes no affirmative obligation, evidence of a housing provider engaging in an interactive process with a tenant is relevant to the refusal inquiry.  *See, e.g., Smith v. Powdrill*, No. CV-12-06388-DDP(RZx), 2013 WL 5786586, at *7 (C.D. Cal. Oct. 28, 2013) (analyzing interactive process evidence, *inter alia*, under failure to accommodate).

2015 regarding the parking spot for her mother, and was told her mother was second in line. (*Id.* ¶36.) The FAC does not identify whether Defendants provided an assigned parking spot. Defendants move for summary judgment on the ground that they provided Elliott the first available assigned parking space they could provide her. (ECF No. 92 at 9–10.) Plaintiffs contend there is a triable issue whether Defendants' delay constituted a constructive denial. (ECF No. 120 at 20.) The Court finds that Defendants are entitled to summary judgment.

As an initial matter, Plaintiffs have failed to produce evidence that an assigned parking was an accommodation "necessary" to ameliorate the effects of Elliott's disability, Alzheimer's, so that she could enjoy the use of her apartment at Civita. "Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap." *Salute v. Stratford Greens Garden Apts*., 136 F.3d 293, 301 (2d Cir. 1998). Courts have recognized that a tenant with a mobility-related disability may be entitled to a parking space adjacent to the tenant's dwelling as a reasonable accommodation. *See, e.g., Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996) (affirming HUD order issued under FHA sanctioning apartment owner for failure to provide parking space for tenant with multiple scleroris); *Shapiro v. Cadman Towers, Inc*., 51 F.3d 328, 335 (2d Cir. 1995) (plaintiff had multiple sclerosis, which resulted in difficulty walking, urinary problems, and fatigue); *Solodar v. Old Port Cove Lake Point Tower Condo. Ass'n*, No. 12-80040-Civ-Marra, 2012 WL 1570063, at *5 (S.D. Fla. May 2, 2012) (plaintiff had cardiovascular condition which substantially limiter her mobility); *Sporn v. Ocean Colony Condo. Ass'n*, 173 F. Supp. 2d 244, 248–249 (D.N.J. 2001) (plaintiff had severe spinal stenosis and was confined to wheelchair); *Trovato v. City of Manchester*, 992 F. Supp. 493, 498 (D.N.H. 1997) (plaintiffs had muscular dystrophy and could only walk tentatively and with extreme difficulty). In these cases, the need for a parking space is clear because the tenant "faces injury or pain by having to travel long distances from the house to the car." *Cal. Mobile Home Park Mgmt. Co*., 107 F.3d

at 1381.

Here, the reason underlying Brown's request for an assigned parking spot for Elliott was to enable Elliott's multiple caregivers to have a parking spot at Civita, not for a mobility-related impairment of her own.[11] This request is thus "distinguishable from [the] line of cases . . . requiring landlords to make reasonable accommodations by providing handicapped parking spaces for handicapped tenants" with mobility impairments. *Id.* at 1381. Thus, to establish a causal link between the request and Elliott's disability, Plaintiffs must provide evidence showing that the assigned parking space was necessary for Elliott's caregivers to provide services to her. *Id.* ("Plaintiff submitted no evidence explaining why Dawson could not have parked outside of the mobile home park and still have provided caregiver services to Cohen-Strong's daughter."). Brown does not dispute that visitor parking spaces were available. (Brown Decl ¶3.) Elliott's caregivers used those spaces beyond the 2-hour time limit without consequence, which Plaintiffs do not dispute. (Castanon Decl. ¶5.) Plaintiffs provide no evidence that Elliott's care was diminished without an assigned parking space. Rather, the record shows that Elliott's caregivers provided services to Elliott without the space. Under these circumstances no reasonable jury could find that an assigned parking space was necessary for Elliott's caregivers to provide services and, in turn, for Elliott to enjoy the use of her apartment. *Compare Cal. Mobile Home Park Mgmt.*, 107 F.3d at 1382 ("[Plaintiff] failed to show that the [parking] policy prevented a third party from being able to provide care services, or that it diminished the care she could receive.") *with Robison v. Amcal Wood Ranch Fund XXXVII*, CV 07-4862 SVW (JCx), 2008 WL 9888773, at *11–12 (C.D. Cal. Sept. 23, 2008) (distinguishing *Cal. Mobile* when plaintiffs

---

[11] Neither of Elliott's reasonable accommodation requests show that Elliott had a mobility impairment. For example, Elliott's physician prescribed an emotional support animal for Elliott's "mental illness" which causes her "stress/anxiety and loneliness." (ECF No. 120-5 Ex. 2.) Elliott's unit transfer request in turn states that her disability is "dementia severe brain handicap." (ECF No. 120-7 Ex. 5.)

provided evidence that caregiver needed to be present for 24 hours a day to care for disabled tenant with terminal lung cancer, there was no parking available within two and half miles of complex, and visitor parking spaces were often occupied such that caregivers had to search for a spot, putting plaintiff at risk if there was an emergency).

Even assuming that an assigned parking space was a necessary accommodation, Defendants have provided a legitimate reason regarding the delay in providing an assigned space: lack of availability. The undisputed evidence shows that Civita has only 124 assignable parking spots for 150 units, excluding five handicap parking spots and two visitor parking spots. (Jt. Stmt. ¶7; Castanon ¶4.) Castanon reviewed all residents' rental applications, including Elliott's application, to determine who had a car and would need a spot. (Jt. Stmt. ¶8; Castanon ¶4.) Only after spots were assigned did Brown request an assigned parking spot, around May 2015. (Jt. Stmt. ¶9; Castanon ¶5; Brown Decl. ¶8.) Castanon informed Brown that all spots were assigned and that Elliott would be placed on a waiting list. (Castanon Decl. ¶5.) She also informed Brown that Elliott's caregivers could use the two-hour office parking spots when they were available. (*Id.*) In August 2015, when Brown followed up regarding an assigned parking space, Castanon told her that Elliott was second in line. (Jt. Stmt. ¶¶16–17; Castanon Decl. ¶8, Ex. 2.) Elliott was assigned a parking space in November 2015 when the first assignable space became available. (Jt. Smt. ¶18; Castanon Decl. ¶9, Ex. 3.)

Plaintiffs provide no evidence showing that an assignable parking space was available beforehand. Nor do they produce evidence showing that Defendants subjected Elliott's caregivers to injury based on their parking. *See, e.g., Astralis*, 620 F.3d at 69 (refusal occurred when condominium association cited residents for parking infractions). Under these facts, no reasonable juror could conclude that Defendants' delay in providing an assigned parking spot was a constructive denial. *See, e.g.*, *Logan*, 57 F. Supp. 3d at 257 (delay must be caused by defendant's unreasonableness, unwillingness to the grant the requested accommodation, or bad

– 29 –

faith to constitute constructive denial, not by a benign reason). Accordingly, the Court grants summary judgment to Defendants on this claim.

### b. Other Parking Requests

Plaintiffs allege two other incidents related to parking requests. First, Plaintiffs allege that Castanon refused to permit Brown to park at the curb near Elliott's apartment. (FAC ¶¶29–31.) Defendants move for summary judgment on the ground that the curb was designated a fire lane at all times and thus it was illegal under California law to park there. Second, Plaintiffs allege that Castanon refused to permit Brown to park in a handicapped parking spot at Civita, unless Elliott was driving the vehicle. (FAC ¶22.) Defendants move for summary judgment on the ground that Brown never obtained a handicap parking placard. Without the placard, Defendants contend that Elliott was not qualified for the parking space. In opposition to summary judgment, Plaintiffs assert that they do not contend that Defendants denied their requests to park at the curb or a handicap parking space on the basis of disability. (ECF No. 120 at 19–20.) The Court construes this as a concession to granting summary judgment to the extent Plaintiffs' requests to park at the curb and for a handicap parking space are Section 3604(f)(3)(B) claims. Accordingly, the Court grants summary judgment to Defendants on these claims.

### B. Section 3604 Claims of Discriminatory Treatment

The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . or national origin." 42 U.S.C. §3604(b). The FHA similarly extends this prohibition to discrimination on the basis of a "handicap" of a person, a person residing or intending to reside in a dwelling after it is rented, or any person associated with that person. 42 U.S.C. §3604(f)(2). Under these provisions, the FHA not only demands that tenants be able to secure an apartment on a nondiscriminatory basis, but also "guarantees their right to equal treatment once they have become residents of that housing." *Inland Mediation Bd.*

*v. City of Pomona*, 158 F. Supp. 2d 1120, 1148 (C.D. Cal. 2001); *see also Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009) (concluding that "FHA reaches post-acquisition discrimination").

To state a claim under Section 3604(b) or 3604(f)(2), a plaintiff must show that he or she was subjected to different "terms, conditions, or privileges because of a protected status." *Inland Mediation Bd.*, 158 F. Supp. 2d at 1148. A plaintiff may plead and prove discrimination based either on disparate treatment due to membership in a protected group or the disparate impact of a facially neutral policy on a protected group. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002); *Gamble v. City of Escondido*, 104 F.3d 300, 304–05 (9th Cir. 1997). Here, Plaintiffs assert disparate treatment claims based on (1) race and national origin and (2) disability. Defendants move for summary judgment on both claims.

### 1. Disparate Treatment Standard

Disparate treatment claims are analyzed under the standards developed in connection with Title VII of the Civil Rights Act of 1964. *Mustafa v. Clark Cty Sch. Dist.*, 157 F.3d 1169, 1180 n.11 (9th Cir. 1998); *Gamble*, 104 F.3d at 305 (citing *Ring v. First Interstate Mortg., Inc.*, 984 F.2d 924, 926 (8th Cir. 1993)). Courts therefore employ the three-part burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). A plaintiff must first establish a *prima facie* case of disparate treatment. *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999). If the plaintiff establishes a *prima facie* case of disparate treatment, the burden then shifts to the defendant to put forth a legitimate, nondiscriminatory reason for the conduct. *Id.* This showing only requires the defendant to set forth a legally sufficient explanation. *Hous. Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1190 (C.D. Cal. 2004). If the defendant rebuts the presumption of discrimination, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the defendant's

proffered reason is pretextual. *Harris*, 183 F.3d at 1051. The plaintiff may establish pretext either directly, by proving that a discriminatory purpose "more likely motivated" the defendant, or indirectly, "by showing that the defendant's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256; *Gamble*, 104 F.3d at 305. To show pretext, the plaintiff need not introduce additional evidence; the factfinder can consider the evidence put forth by the plaintiff in support of the *prima facie* case. *Burdine*, 450 U.S. at 256.

"[P]roof of discriminatory motive is crucial to a disparate treatment claim." *Gamble*, 104 F.3d at 305 (citing *Familystyle of St. Paul, Inc. v. City of St. Paul*, 728 F. Supp. 1396, 1401 (D. Minn. 1990, *aff'd*, 923 F.2d 91 (8th Cir. 1991)); *see also Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d 35 at 49 ("[P]laintiffs must present evidence that animus against the protected group was a significant factor in the position taken by the defendant." (citation omitted)). A plaintiff may show disparate treatment simply by providing direct evidence that a protected group has been subjected to explicitly differential or discriminatory treatment. *Cabrera v. Alvarez*, 977 F. Supp. 2d 969, 976 (N.D. Cal. 2013). Direct evidence "is . . . 'evidence of conduct or statements . . . that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that [the discriminatory] attitude was more likely than not a motivating factor in the . . . decision.'" *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1993)). When direct evidence of discriminatory intent does not exist, "[d]iscriminatory intent may be inferred from the totality of the circumstances." *Id*. When a plaintiff has provided direct or circumstantial evidence of discriminatory intent, the plaintiff has established a *prima facie* case of disparate treatment and may be able to survive a motion for summary judgment on that evidence alone. *Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir. 1985). "Once a *prima facie* case is established . . . summary judgment for the defendant will ordinarily not be

appropriate on any ground relating to the merits because the crux of [the] dispute is the elusive factual question of intentional discrimination." *Id.* at 1009.

### 2. Disability Discrimination

The FAC alleges that around May 26, 2015, Elliott fell at the apartment and was hospitalized. (FAC ¶28.) Upon returning from the hospital, Brown parked at the curb next to Elliott's apartment. (*Id.* ¶29.) The curb was unmarked and there were no signs indicating that parking was prohibited. (*Id.*) Plaintiffs allege that when Castanon saw Elliott trying to exit the vehicle, she stated that parking was prohibited there and refused to permit Elliott to get out of vehicle there. (*Id.*) Shortly thereafter, Castanon forbid Brown from parking at the curb and caused no parking signs to be erected in front of Elliott's apartment. (*Id.* ¶30.) Castanon allegedly threatened to tow Brown's vehicle if she parked in the area, told Brown that she did not care Elliott had a disability and was unwilling to make any accommodations in parking due to Elliott's disability. (*Id.* ¶31.) Defendants move for summary judgment on the ground that the curb was always a designated fire lane and therefore parking there was illegal pursuant to California Vehicle Code §22500.1. (ECF No. 92 at 6–7.) In opposition, Plaintiffs assert that there is a triable issue whether Defendants' treatment of them constitutes disparate treatment on the basis of disability. (ECF No. 120 at 19.) The Court finds there are disputed factual issues that make summary judgment improper.

Even accepting that Defendants have stated a potentially legitimate reason for Castanon's conduct on the ground that parking in a designated fire lane is prohibited, the factual dispute between the parties leaves much to question as to what that should mean here. The California law on which Defendants rely requires that a fire lane "designation shall be indicated" by a sign "clearly stating . . . that the place is a fire lane;" by outlining or painting in red and "marking the place with the words 'fire lane,' which are clearly visible from a vehicle;" or by a red curb or red paint "clearly marked" with the words "fire lane." *See* CAL. VEH. CODE §22500.1. The parties dispute whether the curb was properly marked as a designated fire lane or that "no

parking" signs were in place when Brown attempted to park there at the end of May 2015. (*Contrast* Brown Decl. ¶10 *with* Castanon Decl. ¶6; Brown Dep. at 176:7–9, 176:16–17.)[12]  Drawing reasonable inferences in favor of Plaintiffs, these facts suggest that even if the curb was designated as a fire lane, there was no indication or at least inconsistent indication, of this to tenants.

The record also suggests that Defendants were not treating the curb's fire lane designation as an outright prohibition on vehicles being at the curb.  Brown has testified that other tenants parked at the curb during this time.  (Brown Dep. at 176:19–22.)  Castanon's declaration also states that she "never threatened to tow Brown's car or said anything to her *if it was just to pick up or drop off Ms. Elliott*." (Castanon Decl. ¶6 (emphasis added).)  Drawing reasonable inferences in favor of Plaintiffs, these facts suggest the Defendants exercised discretion regarding how they enforced curb parking.  Differential enforcement of rules in connection with the provision of housing may serve as a basis for an FHA claim when it is based on a protected status.  *Compare, e.g., Yazdinian v. Las Virgenes Vill. Cmty. Ass'n*, 2012 WL 13009122, at *12 (C.D. Cal. July 2, 2012) (denying summary judgment when plaintiffs produced evidence that rules were more strictly enforced against them based on a protected characteristic) *with Carpenter v. Churchville Greene Homeowner's Ass'n*, No. 09-CV-6552, 2011 WL 6016623, at *4 (W.D.N.Y. Dec. 2, 2011) (granting summary judgment regarding "uneven[] enforcement" of parking regulation when there was no evidence that actions were "based on any animus against disabled persons").

---

[12] Defendants attempt to rely on a single Google map image as proof that "no parking" signs existed as early as April 2015.  (RFJN Ex. 6.)  This is a disputed factual issue.  While the Court has taken notice of the existence of the Google map image, it does not take notice of the image to resolve that dispute. *See, e.g., Bingham v. Holder*, 637 F.3d 1040, 1045 n.3 (9th Cir. 2011) (declining to take judicial notice of contents of a website because "[t]he content of particular websites on a specified date in 2007 is not 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'") (citing Fed. R. Evid. 201).

Plaintiffs have produced evidence that Elliott's disability played a role in Castanon's conduct. *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003) ("a plaintiff need simply show that a protected characteristic played a role in the defendant's decision to treat her differently.") Specifically, Brown states that when Castanon prohibited her from parking at the curb near Elliott's apartment, Castanon stated she did not care Elliott had a disability and she was unwilling to make any accommodations in parking. (Brown Decl. ¶10.) This evidence is sufficient to create a triable issue whether Castanon intended to discriminate on the basis of disability, at least with respect to conduct before permanent "no parking signs" clearly demarcated the area as a "fire lane", and further suffices to rebut Defendants' legitimate reason as pretextual. *See, e.g., Sanders v. SWS Hilltop*, LLC, No. 6:17-cv-00256-MC, 2018 WL 934608, at *6 (D. Or. Feb. 16, 2018) (direct evidence of discriminatory intent based on statements that defendants would only offer plaintiff an apartment with puke-stained carpet and an inflated deposit because of his "large service animal"); *Patton v. Hanassab*, No. 14cv1489 AJB (WVG), 2016 WL 4507022, at *6 (S.D. Cal. Aug. 29, 2016) (denying summary judgment when plaintiff made *prima facie* case of discrimination in violation of FHA based on directly discriminatory statements); *Intermountain Fair Hous. Council v. CVE Falls Park, L.L.C.*, No. 2:10-cv-00346-BLW, 2011 WL 2945824, at *7 (D. Idaho July 20, 2011) (finding triable issue regarding violation of Section 3604(f) based on statements by defendants' employees from which a jury could infer discrimination defendants were unwilling to make reasonable accommodations for persons with disabilities). Castanon disputes that she had any animus toward Elliott or Brown. (Castanon Decl. ¶21.) That determination is properly left to a jury.

### 3. Race and National Origin Discrimination

Plaintiffs allege that Defendants discriminated against Elliott, who is Japanese-American, on the basis of her race and national origin in violation of the FHA. (FAC

¶¶1, 4, 14.)  In order to show disparate treatment, "a plaintiff must establish that the defendant was *motivated* to discriminate against the plaintiff on the basis of race." *Garcia v. Country Wide Fin. Corp.*, No. EDCV 07-1161-VAP (JCRx), 2008 WL 7842104, at *7 (C.D. Cal. Jan. 17, 2008) (citing *AFSCME v. State of Washington*, 770 F.2d 1401, 1406–07 (9th Cir. 1985) (emphasis in original)).  The only allegation regarding race and national origin discrimination is that "on information and belief . . . Ms. Castanon denied the request [for an emotional support animal], in part, because of Ms. Elliott's race and/or national origin." (*Id.* ¶19–20.)  Defendants move for summary judgment on the ground that Plaintiffs have failed to produce any evidence to substantiate their claim of race and national origin discrimination.

In opposition, Plaintiffs provide no evidence of race and national origin discrimination regarding Elliott's emotional support animal.  Plaintiffs do appear to assert differential treatment based on race and national origin for Brown's curb parking.  Brown states that she "had observed other tenants regularly using the area for parking" and "[t]he vast majority of those persons were white." (Brown Decl. ¶10.)  Although Plaintiffs make this averment in a declaration, they do not argue a disparate treatment claim based on race or national origin based on this, nor does the FAC allege such a claim.[13]  In any event, this single averment of race discrimination, unsupported by concrete non-speculative evidence, in the entire record is insufficient to show intentional discrimination on the basis of race or national origin.  *Compare Tuggles v. City of Antioch*, No. C08-01914 JCS, No. C08-01914 JCS, at *17 (N.D. Cal. Oct. 2, 2009) ("one allegedly racist remark" was "little evidence of disparate treatment or intentional discrimination" based on race) *with Sturm v. Davlyn Invs.*

---

[13] Generally, a plaintiff may not raise a new theory of liability for the first time in her opposition to summary judgment without amending her complaint.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *see also Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.").

*Inc.*, No. CV 12-07305 DMG (AGRx), 2013 WL 8604662, at *2–3 (C.D. Cal. Sept. 30, 2013) (plaintiffs presented evidence that employees referred to African-Americans as "you guys" and "you people" and other racial slurs; accused only African-Americans of selling drugs, loitering and drinking; and prevented African-Americans from using certain areas of building); *see also Smith-Jeter*, 2016 WL 898543, at *7 (African-American plaintiff's assertion that other residents who did not pay rent did not receive eviction notices while she did was insufficient to withstand summary judgment on race-discrimination FHA claim); *Brooks*, 2015 WL 3407415, at *2–3 (mere allegation that defendant served African-American plaintiff a ten-day notice for failure to pay rent, but did not serve some other tenants who she speculated were white was insufficient to establish disparate treatment).

Here, Plaintiffs' claims of race and national origin discrimination are simply mere allegations. "[M]ere allegations are insufficient to survive defendant's summary judgment motion." *Smith-Jeter v. ArtSpace Everett Lofts Condo. Ass'n*, No. C14-1584-JPD, 2016 WL 898543, at *7 (W.D. Wash. Mar. 9, 2016), *aff'd*, 689 Fed. App'x 862 (9th Cir. 2017) (citing *Collins v. Chesapeake Commons Holdings, LLC*, No. CIV-09-1816, 2011 WL 2580360, at *4 (E.D. Cal. June 28, 2011)). Accordingly, the Court grants summary judgment to Defendants on all race and national origin discrimination claims.

### C.     Section 3604(c) Discriminatory Statements Claim

The FHA makes it unlawful "[t]o make, print, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, intention to make any such preference, limitation, or discrimination." 42 U.S.C. §3604(c). HUD has interpreted Section 3604(c) to "apply to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. §100.75(b). A Section 3604(c) claim does not require discriminatory intent and is not analyzed under a burden-shifting paradigm. *Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1245 (E.D. Cal. 2009);

*Hous. Rights Ctr.*, 404 F. Supp. 2d at 1193 (citing *Fair Hous. Congress v. Weber*, 993 F. Supp. 1286, 1290 (C.D. Cal. 1997)). Moreover, Section 3604(c) protects not only prospective tenants, but existing ones as well. *Hous. Rights Ctr.*, 404 F. Supp. 2d at 1193 (citing *Hous. Rights Ctr. v. Sterling*, 274 F. Supp. 2d 1129, 1142 (C.D. Cal. 2003)).

Although Defendants purport to move for summary judgment on all FHA claims, they have noticeably failed to address Section 3604(c) claims and, therefore, have failed to meet their burden to show that they are entitled to summary judgment. At oral argument, Defendants argued that they did not move for summary judgment on the Section 3604(c) claims because such claims were not pleaded. (ECF No. 165.) However, (1) the FAC expressly alleges that Castanon made specific discriminatory statements regarding disability while Elliott resided at Civita and (2) the FAC generally alleges claims under the FHA, 42 U.S.C. §3601, *et seq*. (FAC ¶¶14(A), 31, 57–58.) To the extent Defendants contend that Section 3604(c) must have been specifically pleaded, the Court rejects this contention because the factual allegations gave Defendants notice of Section 3604(c) claims. *See Yeiser Research & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, (S.D. Cal. 2017) ("[T]he focus of the Federal Rules is on whether the factual allegations of the Complaint—not the precise pleading of a specific statute or law—provide [Defendants] with fair notice of the claims asserted against [them]."). Accordingly, Section 3604(c) claims are properly before the Court and, as noted, Defendants did not address them.

At summary judgment, Brown declares that, in connection with Brown's attempts to park at the curb near Civita, Castanon said that she did not care that Elliott had a disability and that she was unwilling to make any accommodations for Elliott. (Brown Decl. ¶12.) "[O]penly discriminatory oral statements" are plainly covered by Section 3604(c). *Harris*, 183 F.3d at 1054 (finding that plaintiff made a *prima facie* case of discrimination based on overhearing oral statement that "[t]he owners don't want to rent to blacks" and reversing grant of summary judgment); *Soules v.*

*HUD*, 967 F.2d 817, 824 (2d Cir. 1992). Plaintiffs have presented sufficient evidence regarding a Section 3604(c) violation based on these statements that are inappropriate for resolution on summary judgment.

Plaintiffs also state that they have a Section 3604(c) claim based on Castanon's statement that Elliott could not use a handicapped parking space unless she was the driver. (ECF No. 120 at 18; Brown Decl. ¶8.) The claim is based on the ground that California law permits another person to use a disabled person's vehicle that has been fitted with a handicap placard so long as that person is in the presence of the disabled person. *See* CAL. VEH. CODE §4461. Although the Ninth Circuit has not addressed the appropriate standard for assessing when a statement that is not openly discriminatory violates Section 3604(c), several circuits have adopted the "ordinary reader or listener" standard. *See Ragin v. New York Times Co.*, 923 F.2d 995, 999–1000 (2d Cir. 1991), *cert. denied*, 502 U.S. 821 (1991); *Jancik v. Dep't of Hous. & Urban Dev.*, 44 F.3d 553, 556 (7th Cir. 1995); *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972), *cert. denied*, 409 U.S. 934 (1972). District courts in the Ninth Circuit have followed the lead of these circuits. *See, e.g., Pack*, 689 F. Supp. 2d at 1245 (applying "ordinary reader or listener" standard); *Hous. Rights Ctr.*, 404 F. Supp. 2d at 1193; *Llanos v. Estate of Coehlo*, 24 F. Supp. 2d 1052, 1057 (E.D. Cal. 1998); *Fair Hous. Congress*, 993 F. Supp. at 1290. It is not clear to the Court that this statement satisfies the "ordinary listener" standard, but Defendants have not moved on this issue, nor argued the point in reply. Accordingly, the Court denies summary judgment on Plaintiffs' Section 3604(c) claims in their entirety.

### D. Section 3617 Retaliation Claims

Plaintiffs allege that Defendants retaliated against Plaintiffs' filing of a discrimination complaint with the California Department of Fair Employment and Housing ("DFEH") by withdrawing a prior offer of a two-bedroom apartment on December 2, 2015 and by serving a Notice of Lease Violation ("Notice") on Elliott. (FAC ¶¶50–51.) Defendants move for summary judgment on the ground that the

single notice of noise violation is not an adverse action under the FHA. (ECF No. 92 at 14–15.) They have also argued that they did not withdraw the two-bedroom offer. (*Id.* at 12.) The Court finds that Defendants are entitled to summary judgment.

The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section 3603, 3604, 3605, or 3606." 42 U.S.C. §3617. A Section 3617 claim does not require a substantive violation of Sections 3603 through 3606. *United States v. City of Hayward*, 36 F.3d 832, 836 (9th Cir. 1994). To state a *prima facie* claim of retaliation, a plaintiff must show that (1) she was engaged in an activity protected by the FHA; (2) the defendant subjected her to an adverse action causally linked with the plaintiff's exercise of a protected activity, and (3) the plaintiff suffered injury. *See San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998); *see also Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001). To assess a Section 3617 retaliation claim, courts apply the *McDonell Douglas* burden-shifting framework. *See id. at* 563–64; *Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d 35 at 54. If a plaintiff makes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for its action. *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001). A plaintiff may in turn produce evidence showing that the proffered reason is pretextual.

### 1.    Protected Activity

As an initial matter, Elliott was engaged in an activity protected by the FHA. Specifically, Brown filed the DFEH Complaint on behalf of Elliott on October 15, 2015 against the Defendants. (Jt. Stmt. ¶1; Brown Decl. ¶17; *see also* ECF No. 92-2 Ex. 2 (DEFH Complaint).) The filing of a housing discrimination complaint is a protected activity. *See Reg'l Econ. Cmty. Action Program,* 294 F.3d at 54 (noting that filing a HUD complaint is a protected activity); *United States v. Barber*, No. C13-5539, 2014 WL 4988200, at *9 (W.D. Wash. Oct. 7, 2014); *Kendrick v.*

*Greenburgh Hous. Auth*., No. 07-CV-5859 (CS), 2011 WL 1118664, at *9 (S.D.N.Y. Mar. 22, 2011); *Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432 (S.D.N.Y. 2005) (filing of HUD complaint was a protected activity for purposes of Section 3617 claim).  Defendants do not dispute this.

### 2.    Adverse Actions and Casual Connection

To constitute unlawful retaliation under Section 3617, the adverse action against the plaintiff must be in the form of "coercion, intimidation, threats, or interference."  *Walker*, 272 F.3d at 1128 (citing 42 U.S.C. §3617).  The term "interference" in the FHA "has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws."  *Walker*, 272 F.3d at 1129.  For example, an adverse action "may be based upon discriminatory conduct which is designed to drive the individual out of his or her home."  *Egan v. Schmock*, 93 F. Supp. 2d 1090, 1093 (N.D. Cal. 2000).  An eviction proceeding by a defendant against a tenant plaintiff may be an adverse action.  *Reyes v. Fairfield Props*., 661 F. Supp. 2d 249, 267 n.10 (E.D.N.Y 2009.).  The threat of legal action against a tenant may also constitute an adverse action.  The "basic principle" of Section 3617 is "that in order for an alleged adverse action to constitute unlawful retaliation, the action must have some materially adverse effect on the plaintiff . . ."  *Marks v. BLDG Mgmt. Co*., 99 Civ. 5733 (THK), 2002 WL 764473, at *11 (S.D.N.Y. April 26, 2002).  Moreover, a plaintiff must show that a defendant took an adverse action with the intent to retaliate against the plaintiff.  *See East-Miller v. Lake Cty. Highway Dev*., 421 F.3d 558, 563 (7th Cir. 2005).  Such intent demonstrates a causal connection between the adverse action and the protected activity.  The Court assesses both the Notice and two-bedroom issue against this standard.

### a.    Notice of Lease Violation

Despite engaging in a protected activity, Elliott has produced no evidence showing that the Notice was a materially adverse action causally connected to her

– 41 –

DFEH Complaint.  The Notice was issued after another resident complained of noise coming from Elliott's apartment on December 1, 2015.  (Guion Decl. Ex. 1 ("Notice of Lease Violation").)  Plaintiffs do not dispute that a resident complained of noise in Elliott's apartment, or that noise emitted from Elliott's apartment which caused the resident to complain.  Under these circumstances, Plaintiffs have failed to show that the Notice constituted a retaliatory action on account of their filing the DFEH Complaint.[14]  *See, e.g., Stein*, 2016 WL 912176, at \*16, n.21 (determining that "no reasonable jury could conclude that issuance of this notice qualifies as" retaliation in part because it was issued after receipt of complaints from other tenants); *Terry*, 2014 WL 4686570, at \*9 (plaintiff's nonpayment of rent was legitimate non-discriminatory reason for alleged retaliatory acts); *Ward v. Dickens*, No. 3:11CV-362-H, 2012 WL 1038184, at \*3 (W.D. Ky. Mar. 26, 2012) (defendant's proffered reason that plaintiff had failed to pay rent as basis for the alleged retaliatory conduct was legitimate, nondiscriminatory reason); *McColm v. San Francisco Hous. Auth.*, No. C 06-07378 CW, 2009 WL 2901596, at \*8 (N.D. Cal. Sept. 4, 2009) (defendants showed that the alleged retaliatory acts were due to plaintiff's conduct unrelated to protected activity).

Plaintiffs have also produced insufficient evidence that the Notice was materially adverse.  Plaintiffs assert that they feared Defendants were creating a case to evict Elliott based on the Notice.  (ECF No. 120 at 10; Brown Decl. ¶20.)  A

---

[14] Plaintiffs ascribe a retaliatory intent to Guion's issuance of the Notice on that ground that Guion did not hear noise coming from Elliott's apartment when Guion responded to the neighbor's complaint.  (ECF No. 120 at 17; Brown Decl. ¶21.)  However, Plaintiffs offer no evidence showing that this procedure was different from how other residents were treated with respect to noise complaints.  *Cf. Lynn v. Vill. of Pomona*, 212 Fed. App'x 38 (2d Cir. 2007) (affirming summary judgment on Section 3617 claim when evidence showed all persons in plaintiff's position were subject to same level of scrutiny); *Johnson v. YWCA Residence, LLC*, 2014 U.S. Dist. LEXIS 94587, at \*18 (S.D.N.Y. July 9, 2014) (no evidence of retaliatory conduct when there were no differences in treatment among tenants).

subjective belief that Defendants intended to evict Elliott based on the Notice, without more, is an insufficient basis to withstand summary judgment. *See Terry v. Inocencio*, No. 3:11-CV-0660-K-BK, 2014 WL 4686570, at *10 (N.D. Tex. Sept. 2, 2014) ("[M]erely surmising that racial animus is the basis" for allegedly retaliatory actions" "is not competent summary judgment evidence"). The Notice expressly states that "[w]hile we want you to enjoy your apartment we ask you to be courteous and respect the peaceful enjoyment of," contains no "corrective actions" Elliott would be required to take, and does not reference eviction. (Guion Decl. Ex. 1.) No reasonable juror could conclude that this Notice, without more, was an adverse action. *Compare Binns v. City of Marietta Ga*., 704 Fed. App'x 797, (11th Cir. 2017) (affirming grant of summary judgment on Section 3617 retaliation claim when plaintiff presented no evidence that defendants actions "were motivated by an intent to retaliate against her or to harass her) *with Arnal v. Aspen View Condo. Ass'n*, 226 F. Supp. 3d 1177, 1188 (D. Colo. 2016) (denying summary judgment on retaliation claim when plaintiff was subjected to fines for having service dog and placed lien on plaintiff's property); *Smith*, 2013 WL 5786586, at *10 (finding retaliation in violation of Section 3617 when defendants issued a 3-day notice and told plaintiff they wanted her out of the apartment if she insisted on keeping an emotional support animal).

### a. Two-Bedroom

Plaintiffs have failed to show a materially adverse action with respect to Elliott's request for a two-bedroom unit. Even assuming that Guion's statement regarding the two-bedroom offer was an adverse action at the time it was made, Defendants have offered a legitimate, nondiscriminatory reason. Specifically, Elliott was not eligible to transfer to a two-bedroom until she received SDHC approval. Plaintiffs offer no "specific, substantial evidence of pretext" regarding this reason. *Idaho Aids Found., Inc. v. Idaho Hous. & Fin. Ass'n*, 422 F. Supp. 2d 1193, 1205 (D. Idaho 2006). Defendants have further shown that once Elliott completed the SDHC paperwork, she was approved for the two-bedroom transfer and in fact transferred to

the apartment. Under these circumstances, "Plaintiff neither suffered actual interference with her use and enjoyment of her apartment, nor was she 'actually chilled' in the exercise of her rights under the Fair Housing Act" and "no reasonable jury could find that Plaintiff suffered an adverse action in retaliation for having engaged in protected activity." *Marks*, 2002 WL 764473, at *14 (reversing jury verdict on Section 3617 claim when there was no evidence that plaintiff suffered a materially adverse action). Accordingly, the Court grants summary judgment to Defendants on Elliott's retaliation claim under Section 3617.

## V. UNRUH ACT CLAIM

The FAC asserts claims against Defendants under the California's Unruh Civil Rights Act, CAL. CIV. CODE §51, based on Defendants' alleged discrimination on the basis of race, national origin, and disability. (FAC ¶¶61–63.) Defendants move for summary judgment on the ground that since Plaintiffs cannot provide sufficient evidence showing denials of reasonable accommodations or an intent to discriminate on the basis of disability, Plaintiffs' Unruh Act claims fail. (ECF No. 92 at 18–20.) In opposition, Plaintiffs expressly limit their Unruh Act claim analysis to disability discrimination. (ECF No. 120 at 21.) The Court similarly limits its summary judgment analysis on this claim.[15]

The Unruh Act provides that: "[a]ll persons within the jurisdiction of this state are free and equal, no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." CAL. CIV. CODE §51(a). A plaintiff who asserts disability discrimination in violation of the Unruh Act must establish that:

---

[15] Defendants are entitled to summary judgment on Plaintiffs' Unruh Act claims to the extent that they are premised on race and national origin discrimination. The Court's analysis of Plaintiffs' disparate treatment claims under the FHA on the basis of race and national origin forecloses their Unruh Act claims on these grounds. *See, e.g., Burgess v. Hous. Auth.*, No. C01-04098 MJJ, 2006 WL 7347315, at *13 (N.D. Cal. Dec. 30, 2006).

"(1) [s]he was denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment; (2) [her] disability was a motivating factor for this denial; (3) defendants denied plaintiff the full and equal accommodations, advantages, facilities, privileges, or services; and (4) defendants wrongful conduct caused plaintiff to suffer injury, damage, loss, or harm." *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1048 (N.D. Cal. 2012) (quoting *Johnson v. Beahm*, No. 2:11-cv-0294-MCE-JFM, 2011 WL 5508893, at *4 (E.D. Cal. Nov. 8, 2011)); *see also Harris v. Capital Growth Investors XIV*, 805 P.2d 873, 893 (Cal. 1991) ("[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act"), *superseded by statute on other grounds as explained in Munson v. Del Taco, Inc.*, 208 P.3d 623, 627–30 (Cal. 2009).

The Unruh Act also provides that a "violation of the right of any individual under the federal Americans with Disabilities Act [ADA] . . . shall also constitute a violation of this section." CAL. CIV. CODE §51(f).  This language relieves a plaintiff of having to prove intentional discrimination with respect to Unruh Act ADA-based claims.  However, when a disability-based Unruh Act claim is brought independently of an ADA claim, the plaintiff's obligation to show intentional discrimination remains.  *See Munson*, 208 P.3d at 627; *see also Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014).

Defendants argue that summary judgment is warranted because the Unruh Act does not require reasonable accommodations in residential housing, relying on cases in which courts have found that the scope of the ADA similarly limits the Unruh Act. *See Rodriguez v. Morgan*, No. CV 09-8939-GW(CWx), 2012 WL 253867, at *4 (C.D. Cal. Jan. 26, 2012) (finding that because residential apartment complexes are not a "public accommodation" under the ADA, "the Unruh Act does not require a landlord to engage in reasonable accommodation of a disabled tenant as to residential housing."); *see also Holland v. Related Cos.*, No. 15-cv-03220-JSW, 2016 WL

3669999, at *5 (N.D. Cal. July 11, 2016) (granting summary judgment on Unruh Act claim premised on reasonable accommodation in residential portions of complex); *Smith*, 2013 WL 5786586, at *11 (agreeing with *Rodriguez* and granting summary judgment on Unruh Act reasonable accommodation claims). To the extent Plaintiffs assert Unruh Act claims based on Defendants' alleged failure to provide reasonable accommodations in Elliott's apartment, Defendants are entitled to summary judgment.

However, even if the Unruh Act does not require reasonable accommodations in residential housing, that limitation is beside the point with respect to differential treatment of Plaintiffs in non-residential areas. Because triable issues concerning whether Castanon intended to discriminate on the basis of Elliott's disability with respect to curb parking remain, Defendants are not entitled to summary judgment on this claim insofar as Plaintiffs' Unruh Act is based on that conduct.

## VI. PUNITIVE DAMAGES

Plaintiffs request punitive damages under the FHA and in connection with Plaintiffs' FEHA and Unruh Act state law claims. Defendants move for summary judgment on these requests on the ground that there is insufficient state of mind evidence. (ECF No. 92 at 23.) The Court denies Defendants' motion.

Punitive damages are available under the FHA. *See* 42 U.S.C. §3613(c)(1) (punitive damages recoverable under FHA). Under federal law, punitive damages may be awarded for a defendant's "reckless or callous disregard" of a plaintiff's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 51 (1983). A finding of reckless indifference "ultimately focus[es] on the actor's state of mind," and requires that the defendant "at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). Courts have applied this standard to awards of punitive damages under the FHA. *See So. Cal. Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1153 (C.D. Cal. 2007); *United States v. Tropic Seas*, 887 F. Supp.

1347, 1365 (D. Haw. 1995). An owner of housing—and by extension the member of a board of directors of the corporate owner of such housing—may be liable for punitive damages if he or she "knew of or ratified" a discriminatory act by the owner's agents or the corporation. *Tropic Seas*, 887 F. Supp. at 1365. "[I]n general, intentional discrimination is enough to establish punitive damages liability." *Inland Mediation Bd.*, 158 F. Supp. 2d at 1159–60.

Punitive damages are also available under the FEHA and the Unruh Act. *See* CAL. GOV'T CODE §12989.2 (punitive damages under FEHA); *Commodore Home Sys., Inc. v. Superior Court*, 649 P.2d 912 (Cal. 1982) (punitive damages recoverable under FEHA*); Botosan v. Fitzhugh*, 13 F. Supp. 2d 1047, 1052 (S.D. Cal. 1998) (punitive damages recoverable under Unruh Act). To recover punitive damages under California state law when the defendant is a corporation, "the evidence must demonstrate an officer, director or managing agent of Defendant committed, authorized or ratified an act of malice, oppression or fraud to create a genuine issue of material fact on punitive damages." *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 931 (E.D. Cal. 2013).

Here, Defendants have failed to produce evidence which would show that Plaintiffs are not entitled to punitive damages as a matter of law. When a plaintiff produces evidence that various defendants either participated in the alleged discriminatory acts or knew of and failed to repudiate such acts, there is a triable issue regarding punitive damages under the FHA. *Tropic Seas,* 887 F. Supp. at 1366 (denying motion for summary judgment on FHA punitive damages when plaintiff produced affidavits and authenticated documentation). Given that Plaintiffs have presented sufficient evidence to withstand summary judgment on its Section 3604(f)(2) disability discrimination claim and Section 3604(c) discriminatory statements claims, it is premature to foreclose Plaintiffs from the possible recovery of punitive damages. *See Patton*, 2016 WL 4507022, at *8 (denying summary judgment on punitive damages claim because underlying housing discrimination

claims remained viable); *Ellorin v. Applied Finishing, Inc.*, 996 F. Supp. 2d 1070, 1095 (W.D. Wash. 2014) (finding it premature to grant summary judgment as to punitive damages claim for factual disputes remained regarding the defendant's discriminatory conduct); see also *Sturm v. Davlyn Invs. Inc.*, No. CV 12-07305 DMG (AGRx), 2013 WL 8604662, at *15 (C.D. Cal. Sept. 30, 2013) (denying summary judgment on punitive damages under FEHA and Unruh Act when plaintiffs had established a material dispute of fact regarding racially discriminatory statements). Accordingly, the Court denies summary judgment on this issue.

## VII.   STANDING TO SEEK DECLARATORY AND INJUNCTIVE RELIEF

The FAC requests declaratory and injunctive relief against Defendants, including enjoining Defendants from unlawful acts of housing discrimination and requiring Defendants to take affirmative action to provide equal housing opportunities regardless of race, national origin, and disability.  (FAC ¶¶55–56, Prayer for Relief 1–2.)  Defendants move for summary judgment on the ground that because neither Plaintiff lives at Civita, they no longer have standing to seek injunctive relief.  (ECF No. 92 at 21–22.)  This ground applies equally to Plaintiffs' claim for declaratory relief and so the Court considers it as well.  The Court concludes that Defendants are entitled to summary judgment.

A plaintiff's standing to seek declaratory and prospective injunctive relief "depends on whether he is likely to suffer future injury" which "requires a real and immediate—as opposed to merely conjectural or hypothetical—threat of future injury." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1334 (11th Cir. 2013). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). Defendants produce evidence showing that no Plaintiff resides at Civita.  (Guion Decl. ¶9, Kanno Decl. Ex. 6 at 51–55.)  Plaintiffs do not dispute this evidence, nor do they contend that they intend to reside at Civita in the future.

Plaintiffs' sole challenge to the grant of summary judgment turns on their assertion that the FHA and FEHA provide courts with broad authority to fashion equitable relief to redress past wrongs. (ECF No. 120 at 23) The FHA provides that "if the court finds that a discriminatory housing practice has occurred. . . , the court . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction, . . . or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate." 42 U.S.C. §3613(c)(1). Under this provision, "the district court has the power to order remedial injunctive relief to redress violations of the [FHA] . . ." *Park View Heights Corp. v. Black Jack*, 605 F.2d 1033, 1036 n.5 (8th Cir. 1979). Plaintiffs contend that if the Court determines that Defendants have violated the FHA, the Court may exercise its equitable authority to fashion relief as appropriate. (ECF No. 120 at 23–24.) This argument cannot save Plaintiffs' declaratory and injunctive relief claims from summary judgment. Whatever the scope of permissible relief under the FHA may be as matter of congressional authorization, "[s]tanding must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties" as a matter of a federal court's authority under Article III to award such relief. *Bates v. UPS*, 511 F.3d 974 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 185 (2000)) (emphasis added); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011).[16]

Courts have repeatedly determined that claims for declaratory and prospective injunctive relief related to housing discrimination claims are moot, or that the plaintiff lacks standing to seek such relief, when the plaintiff no longer resides in the

---

[16] Plaintiffs' ability to seek injunctive relief under the FEHA, a California state law, is equally subject to Article III's requirements regarding prospective injunctive relief. "As important as" housing discrimination may be to the California legislature, "the Court cannot lower the threshold for Article III standing based on the imperatives of California's legislature." *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 964 (S.D. Cal. 2016).

defendant's housing.  *See Harris*, 183 F.3d at 1050 ("Ms. Harris' request for declaratory and prospective injunctive relief are rendered moot by Ms. Harris' departure from the . . . [a]partments."); *Hawecker v. Sorensen*, No. 1:10-cv-00085 OWW JLT, 2011 WL 98757, at *3 (E.D. Cal. Jan. 12, 2011) ("Plaintiffs do not have standing to bring claims against Defendant solely for injunctive and declaratory relief.  Plaintiffs are no longer tenants of Defendant . . . . There is no showing of likelihood any of Plaintiffs will be Defendant's tenants in the future, and any declaratory or injunctive relief will not redress their past injuries."); *McGlothin v. Santos*, No. 1:08cv1290 LJO GSA, 2008 WL 5135996, at *4 (E.D. Cal. Dec. 8, 2008) ("Plaintiffs no longer reside at the premises in question and as a result, they lack standing to bring claims requesting equitable relief including declaratory or injunctive relief."); *Inland Mediation Bd.*, 158 F. Supp. 2d at 1161 (granting summary judgment against a plaintiff's injunctive relief claim because she vacated her apartment and "cannot demonstrate a sufficient likelihood that she will again be harmed by these defendants if she is not granted some form of injunctive relief").  Here, because no Plaintiff resides at Civita and Plaintiffs have failed to produce any evidence of a future intent to return, Defendants are entitled to summary judgment.

## VIII.    UCL CLAIM

The FAC asserts that Defendants' conduct violated California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §17200 *et seq*.  (FAC ¶¶64–65.)  The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE §17200.  Any of these prongs may support a UCL cause of action.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999).  As an initial matter, this Court's order on Defendants' motion for judgment on the pleadings, which dismissed Brown's UCL claim for failure to allege specific economic losses caused by an unfair business practice, has mooted Defendants' motion as it pertains to Brown's UCL claim.  (ECF No. 126 at 28.)  Only Elliott's UCL claim is before the Court now.  Elliott's UCL claim is based on

Defendants' violation of the "unlawful" prong based on Defendants' alleged violations of the FHA, FEHA, and the Unruh Act. (ECF No. 120 at 22.) Defendants move for summary for summary judgment on the ground that if Elliott's predicate claims fail, then so does the UCL claim. (ECF No. 92 at 20.) Defendants are entitled to summary judgment here.

Because Elliott does not have standing to seek injunctive relief, she is unable to seek such relief through the UCL. Relief under the UCL is "limited to injunctive relief and restitution." *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682 (Cal. Ct. App. 2010); *see also* CAL. BUS. & PROF. CODE §17203. When a plaintiff fails to satisfy Article III requirements to seek injunctive relief, she may not pursue such relief under a UCL claim in federal court. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021–22 (9th Cir. 2004) (stating that Article III standing requirement may foreclose a plaintiff from pursing a UCL claim for injunctive relief in federal court even if plaintiff could seek that relief in state court); *Campion v. Old Republic Home Prot. Co.*, 861 F. Supp. 2d 1139, (S.D. Cal. 2012) (granting summary judgment to Defendants on plaintiff's UCL claim for injunctive relief because plaintiff "cannot establish that he is under any threat of suffering actual and imminent future harm. Plaintiff's UCL claim is based entirely on a past transaction . . ."). Although Defendants did not expressly seek summary judgment on Elliott's UCL claim on this basis, the Court's resolution of Plaintiffs' claim for injunctive relief compels it.

Further, there is no evidence that Elliott has statutory standing to pursue her UCL claim.[17] Only a plaintiff who has lost money or property as a result of unfair

---

[17] Although Brown no longer has a UCL claim before the Court, Brown contends that she incurred economic losses because "[a]t times I would pick up my mother and drive to a local park so that my mother could see my dog." (Brown Decl. ¶7.) Brown fails to identify concrete economic losses. Even if she had, such losses are not attributable to a viable discrimination claim as the Court has granted Defendants summary judgment regarding a failure to accommodate an emotional

competition has standing to bring a UCL claim. *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 884 (Cal. 2011). A plaintiff must not only establish a loss or deprivation of money or property sufficient to qualify as an injury, she must "show that the economic injury was the result of, *i.e.*, *caused by the unfair business practice . . . that is gravamen of the claim*. *Id*. at 885 (emphasis added). Elliott has never alleged nor produced evidence of any concrete economic loss she incurred from any of Defendants' alleged violations of federal and state anti-discrimination law, let alone a viable discrimination claim. Without this evidence, Elliott lacks UCL standing. *Cavka v. SoulCycle Inc*., No. 8:16-cv-01821-JLS-KES, at *5 (C.D. Cal. Jan. 30, 2017); *Ballard v. Bank of Am., N.A*., No. SACV 12-1698-JLS, 2014 WL 503143, at *2 (C.D. Cal. Jan. 28, 2014). Accordingly, the Court grants Defendants summary judgment.

## IX. CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion for summary judgment as follows:

1. The Court **GRANTS** Defendants' motion for summary judgment with respect to: (1) Plaintiffs' FHA and FEHA claims related to discrimination on the basis of race and national origin; (2) Plaintiffs' FHA Section 3604(f)(3) claims for all reasonable accommodation requests and related FEHA claims; (3) Elliott's FHA Section 3617 retaliation claim and related FEHA claim; (4) Elliott's UCL claim; (5) Plaintiffs' Unruh Act and negligence claims[18] *only to the extent those claims are predicated on a failure to accommodate and race and national origin discrimination*;

support animal for Elliott.

[18] Both parties recognize that Plaintiffs' negligence claims are derivative of Plaintiffs' other claims. (*Compare* ECF No. 92 at 20 *with* ECF No. 120 at 22.) Plaintiffs' negligence claims therefore turn on the Court's resolution of the FHA, FEHA, and Unruh Act claims. *See, e.g., Angstman v. Carlsbad Seapoint Resort II, L.P*., No. 11cv62 L(WMc), 2011 WL 2009999, at *4 (S.D. Cal. May 23, 2011) (because negligence claim was derivative of plaintiff's other causes of action under FHA, FEHA, and Unruh Act, claim only survived as to viable Unruh Act claim).

and (6) Plaintiffs' claims for declaratory and injunctive relief. The Court **DISMISSES WITH PREJUDICE** these claims.

2. The Court **DENIES** Defendants' motion with respect to: (1) Plaintiffs' FHA claims under Section 3604(c) related to discriminatory statements and related FEHA claims; (2) Plaintiffs' FHA Section 3604(f)(2) claim related to discrimination on the basis of disability and related FEHA claim; (3) Plaintiffs' Unruh Act and negligence claims *only to the extent those claims are predicated on the FHA and FEHA claims that remain*; and (4) punitive damages.

3. For the reasons set forth in the Court's prior order on Defendants' motion for judgment on the pleadings (ECF No. 126) and in light of Brown's declaration in opposition to summary judgment (ECF No. 120-30), Defendants' motion is **DENIED** with respect to the Plaintiff Brown's standing to assert claims that survive summary judgment.

**DATED: June 12, 2018**

Hon. Cynthia Bashant
United States District Judge