1
2
3
4
5
6
7
8           **UNITED STATES DISTRICT COURT**

9           **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| NATSUE ELLIOTT, *et al.,* | Case No. 16-cv-0288-BAS-AGS |
| Plaintiffs, | **ORDER:** |
| v. | |
| VERSA CIC, L.P., *et al.,* | **(1) GRANTING DEFENDANTS' POST-TRIAL RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| Defendants. | **[ECF No. 221];** |
| | **(2) DISMISSING PLAINTIFFS' REMAINING CLAIMS IN THE FIRST AMENDED COMPLAINT WITH PREJUDICE** |
| | **[ECF No. 4];** |
| | **(3) DIRECTING ENTRY OF FINAL JUDGMENT IN FAVOR OF DEFENDANTS PURSUANT TO RULE 58;** |
| | **AND** |
| | **(4) CLOSING CASE** |

This case stems from Plaintiff Natsue Elliott's rental of an apartment at the Versa at Civita apartment complex ("Civita"), a senior living community in San Diego, California. Elliott was determined to have Alzheimer's shortly after she moved to Civita in March 2015. She[1] and her daughter, Plaintiff Linda Brown, have contended throughout this litigation that Defendants Versa CIC, LP ("Versa") and ConAm Management Corporation ("ConAm") (together, "Defendants") violated federal and California anti-discrimination laws by discriminating on the basis of disability.[2] Plaintiffs' claims for trial principally concerned whether Defendants discriminated when a Civita manager, Vanessa Castanon, refused to let Brown park at the curb in front of Elliott's Civita apartment in late May 2015. During the course of trial, the parties stipulated that the area was designated as a fire lane. Plaintiffs also raised discriminatory statements claims based on remarks Castanon made related to curb parking and handicapped parking spots at Civita.

Before the Court submitted the claims to the jury, Defendants moved for judgment as a matter of law pursuant to Rule 50(a), which the Court denied. (ECF No. 210.) Thereafter, the jury deadlocked in a 6-1 vote in favor of Defendants and the Court declared a mistrial. (ECF No. 216.) Defendants renew their motion for judgment as a matter of law pursuant to Rule 50(b). (ECF No. 221.) Plaintiffs oppose. (ECF No. 224.) Because a reasonable jury would not have a legally sufficient evidentiary basis to find for Plaintiffs, the Court grants Defendants' Rule 50(b) motion and dismisses with prejudice Plaintiffs' remaining claims.

---

[1] Plaintiff Linda Brown has served as the guardian ad litem for Elliott since this case was initiated in February 2016. (ECF No. 1 (original complaint); ECF No. 2 (Brown's concurrent motion to serve as guardian ad litem for Elliott); ECF No. 6 (Court's order authorizing Brown to serve as guardian ad litem for Elliott).)

[2] The suit also included a third defendant, QF Circa LLC. (ECF Nos. 1, 4.) At the request of Plaintiffs' counsel during final pre-trial proceedings (ECF No. 176), the Court dismissed this Defendant. (ECF No. 177.)

**BACKGROUND**

## A.    Relevant Facts[3]

Prior to renting an apartment at Civita, Plaintiff Natsue Elliott began to experience a mental decline while she resided in Chico, California. (ECF 211, Trial Transcript Vol. 1 ("Trial Tr. Vol. 1.") at 36:2–11.) As a result, Elliott's daughter, Linda Brown, immediately looked for a place in San Diego, California, where Brown resided, and which would make it easier for Brown to care for her mother. (*Id.* at 36:20–37:6.)

Around February 2015, Brown found Civita, a then-new apartment complex which had Section 8 housing available. (*Id.* at 37:7–14, 37:17–20; 38:2–3.) Brown met with Vanessa Castanon regarding Elliott potentially renting an apartment at Civita and Brown completed a rental application on her mother's behalf. (*Id.* at 38:6–7, 38:17–21.) Elliott was approved and moved to Civita at the end of March 2015. (*Id*. at 39:8–14.) The following month, Elliott was determined to have "moderate dementia," specifically, Alzheimer's. (ECF No. 227, Trial Transcript Vol. 2A ("Trial Tr. Vol. 2A") at 91:5–92:20.)

Relevant to the events that ensued were Civita's limited parking offerings. There were approximately 122 parking spots for 150 units, five handicapped parking spots, two spots for two-hour parking, and two office parking spots. (*Id*. at 166:2–8.) Elliott did not drive. (Trial Tr. Vol. 1 at 43:18–20.) In response to a question in

---

[3] The Court's summary judgment order discusses in more detail the factual background of the entire case, including the several claims dismissed at summary judgment. (ECF No. 167 at 5–6.) For the purpose of resolving Defendants' Rule 50(b) motion, the Court solely outlines the factual summary relevant to the claims which remained for trial. The Court draws from the official trial transcript. (ECF Nos. 211, 212, 213, 227.) Consistent with the standard for assessing a Rule 50(b) motion, all facts are taken in the light most favorable to the Plaintiffs. *See White v. Ford Motor Co*., 312 F.3d 998, 1010 (9th Cir. 2002).

Elliott's Civita rental application regarding "Vehicle Type," Brown wrote "N/A," *i.e.*, "not applicable." (Trial Tr. Vol. 2A at 103:6–14.) This response meant little initially because when Elliott first moved to Civita, parking was on a "first-come-first served basis." (Trial Tr. Vol. 1 at 45:10–15.)

At some point, however, Castanon assigned parking spots to Civita tenants and did not assign a spot to Elliott. (*Id*. at 45:16–46:1.) Brown learned that Castanon had assigned parking spots through conversations with other tenants. (*Id*.) Thereafter, when Brown asked Castanon for an assigned parking spot, Castanon said she did not assign a spot because Elliott did not have a car. (*Id*. at 46:9–10.) Brown explained that her mother was disabled and needed a parking spot "for us and the caregivers to be going to doctor's appointments." (*Id*. at 46:11–14.) Castanon apologized and said she would put Elliott on the waiting list for the next available spot. (*Id*. at 46:15–19.) "[R]eally soon after" Castanon assigned parking spots, another Civita tenant, Ted Casselberry, allowed Brown and Elliott to use his parking spot until Elliott received an assigned spot. (*Id*. at 69:2–12.)

After parking spots were assigned and notwithstanding Casselberry allowing Brown to use his spot, Brown had difficulties parking at Civita at various times when she went to see her mother. (*Id*. at 47:1–7.) Sometimes Brown parked in an area in front of Elliott's ground floor apartment which Castanon told her was a fire lane although the curb was not painted red, there was no signs indicating the curb was a fire lane, and there were no fire hydrants. (*Id*. at 47:2–19.) During trial, the parties stipulated that the Civita site plans indicated that this area was designated as a fire access lane. (ECF No. 212, Trial Transcript Vol. 2B ("Trial Tr. Vol. 2B") at 225:5–8.) Trial evidence further showed that the City of San Diego required the fire access lane before the City would approve Civita's construction. (*Id*. at 230:23–231:4 9 ("This particular building, they [the City] wanted fire access along one continuous

side of the building.").)

Before "No Parking" signs were placed up, Castanon told Brown that she was not allowed to park there and if Castanon caught Brown parking there, Castanon would have Brown's car towed. (Trial Tr. Vol. 1 at 49:6–13.) Brown testified that "other people"—"quite a few"—parked there. (*Id*. at 47:20–24, 48:15–18.) Brown further testified that, at some point, she had seen moving vans parked there as well as cars parked there overnight. (*Id*. at 49:2–5.) Brown stated that Castanon "didn't say anything to the other people, just me[.]" (*Id*. at 50:1–3.)

At some point before "No Parking" signs were placed along the curb, Brown asked Castanon about the possibility of using one of Civita's handicapped parking spots. Brown testified this was "[b]ecause I was trying to be creative and . . . get my mom a parking spot." (*Id*. at 69:13–19.) Brown approached Castanon at Civita's on-site office. (*Id*. at 69:24–70:4.) Brown testified that Castanon told her she could not have a spot because her mother was not the person driving. (*Id*. at 71:23–72:2.)[4] In response to this statement, Brown had Elliott's physician fill out a California Department of Motor Vehicles ("DMV") handicapped placard application, a copy of which Brown provided to Castanon. (*Id*. at 72:24–73:7.) Brown, however, did not go to the DMV to obtain an actual handicapped parking placard because "it was too much of a hassle for me . . . and I just didn't want to go to the DMV, and we had already got a parking space from Ted." (*Id*. at 73:8–73:14.) At no point did Elliott have a handicapped placard during her residence at Civita and thus she did not receive permission to park in one of the five handicapped parking spots. (Trial Tr. Vol. 2A at 115:11–13.)

---

[4] During examination, Castanon denied that she ever told Brown that Brown could not park in a handicapped parking spot because her mother needed to be the driver of the vehicle with the placard. (Trial Tr. Vol. 2A at 180:4–7.) For the purposes of this motion, however, the Court assumes the statement was made.

In late May 2015, Elliott tripped on a curb while taking a walk, hit her head and was hospitalized. (Trial Tr. Vol. 1 at 60:3–25.) When Brown brought Elliott to Elliott's apartment after the hospital stay, Brown parked in the area in front of Elliott's apartment. (*Id.* at 61:5–7.) Castanon was outside and told Brown that "[she] couldn't park there" or "I'll have you towed." (*Id.* at 61:3–7; 62:8–9, 62:13–15.) When Brown tried to explain that she was trying to quickly retrieve some things from Elliott's apartment following Elliott's hospital stay, Castanon "just said she didn't care about my mom's disability or hospital stay." (*Id.* at 62:13–18.) Brown told Castanon "go ahead and tow me," left her car parked at the curb with her mother inside the car, and retrieved several items from Elliott's apartment. (*Id.* at 62:10–12, 63:11–16, 63:21–23.) According to Brown, Castanon just shook her head in disbelief because Brown "went above and beyond her rules." (*Id.* at 63:13–20.) After this incident, Elliott stayed with Brown for a few days. (*Id.* at 64:24–65:5.) When Brown returned to Civita, the curb in front of Elliott's apartment remained unmarked. (*Id.* at 65:6–16.) At no point did Brown testify that she was in fact towed for parking at the curb.

In June 2015, Castanon had "No Parking" signs placed at Civita, including along the designated fire lane in front of Elliott's apartment. (*Id.* at 65:20–66:5, 67:9–24.) Brown thought Castanon put the signs up "just to make more problems for me" and she testified that the signs "impacted me deeply." (*Id.* at 66:6–8, 68:6–8.)

Brown explained that "in the beginning" she was at Civita taking care of Elliott "quite a bit, like every day," which lessened to about "50 percent of the time" when she got a caregiver, Melissa Wilder, for her mother around May 2015. (*Id.* at 57:13–15, 77:8–77:11; *see also id.* at 43:21–23.) Throughout Elliott's residence at Civita, Castanon was "rude" to Brown and Elliott when they would run into her at the

apartment complex. (*Id.* at 44:13–17.) "She ignored things that [Brown] said and just never really said hello, didn't acknowledge us [Elliott and Brown]." (*Id.* at 44:13–17.) Wilder, a friend of Brown's, agreed that Castanon was "cold and distant," did not include Elliott in conversations, and "didn't seem to be empathetic, caring, concerned. It was more like—more straight businesslike." (*Id.* at 58:3–7; Trial Tr. Vol. 2B at 214:9–25.) Castanon's behavior humiliated and caused stress for both Brown and her mother. (Trial Tr. Vol. 1 at 63:5–7, 63:21–64:7.)

## B.    Procedural History

Prior to filing this case, Plaintiffs filed a complaint in October 2015 against Defendants with the California Department of Fair Employment and Housing ("DFEH"), alleging that Defendants discriminated on the basis of disability by failing to provide various accommodations requests Plaintiffs made. (ECF No. 92-2 Ex. 2; ECF No. 125 ¶ 1.) The DFEH closed its investigation of Plaintiffs' complaint on January 14, 2016, finding that Plaintiffs received the accommodations they requested from Defendants and there was "insufficient evidence" to otherwise show that Defendants denied accommodations. (ECF No. 92-2 Exs. 3, 4.)

Plaintiffs subsequently brought suit against Defendants in this Court on February 3, 2016, asserting claims concerning race, national origin, and disability discrimination in violation of: (1) the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*; (2) California's Fair Employment and Housing Act ("FEHA"), Cal Gov't Code §§ 12927 and 12955 *et seq.*; (3) the California Unruh Civil Rights Act ("Unruh Act"), Cal Civ. Code §§ 51 *et seq.*; (4) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17204; and (5) a derivative common law negligence claim. (ECF Nos. 1, 4 (First Amended Compl. ("FAC")).) Defendants did not move to dismiss Elliott's claims. Instead, Defendants filed a Rule 12(c) motion for judgment on the pleadings against Brown's claims on the ground that she lacked

standing to assert any claims and fell outside the FHA's zone of interests. (ECF Nos. 46–47.) The Court largely denied the Rule 12(c) motion, but dismissed Brown's retaliation claims and UCL claim. (ECF No. 126); *Elliott v. QF Circa 37, LLC*, No. 16-cv-0288-BAS-AGS, 2017 WL 6389775 (S.D. Cal. Dec. 14, 2017).

Defendants subsequently moved for summary judgment. (ECF No. 92.) The Court granted Defendants' motion in part and dismissed with prejudice Plaintiffs': (1) FHA Section 3604(b) and related FEHA claims for discrimination on the basis of race and national origin; (2) FHA Section 3604(f)(3) and related FEHA claims for reasonable accommodation requests for a support animal, an apartment lockout, a handicapped parking spot at Civita, an assigned parking spot, and a transfer to a two-bedroom apartment at Civita; (3) Elliott's FHA Section 3617 retaliation claim and related FEHA claim; (4) Elliott's UCL claim; (5) Plaintiffs' Unruh Act and negligence claims only to the extent the claims were predicated on a failure to accommodate and race and national origin discrimination; and (6) Plaintiffs' claims for declaratory and prospective injunctive relief for lack of standing. (ECF No. 167 at 52–53); *Elliott v. QF Circa 37, LLC*, No. 16-cv-0288-BAS-AGS, 2018 WL 2933467 (S.D. Cal. June 12, 2018).

The Court otherwise denied summary judgment. (ECF No. 167 at 53.) Defendants failed to move on Plaintiffs' FHA Section 3604(c) and related FEHA claims regarding alleged discriminatory statements and therefore did not meet their summary judgment burden. (*Id*. at 37–39.) In addition, the Court denied summary judgment to Defendants on Plaintiffs' FHA and FEHA disparate treatment claims, and related Unruh Act claim, insofar as the claims concerned discrimination on the basis of disability. (*Id.* at 33–35 (FHA and FEHA claims); *id.* at 44–46 (Unruh Act claim).) Defendants argued that "Plaintiffs cannot proffer any evidence to support their claims for discrimination," including with respect to Brown's parking in a fire

lane.  (ECF No. 92-1 at 24.)  Defendants contended that the curb was a fire lane at the time of the event both in appearance and designation, points which Plaintiffs did not concede.  (*Compare id.* at 67 *with* ECF No. 120 at 5, 19.)  Plaintiffs averred that Castanon (1) permitted others to park at the curb, (2) forbid Brown from briefly parking at the curb when Castanon saw Brown helping Elliott out of the car, and (3) stated she did not care Elliott had a disability whenever she saw Brown parking at the curb.  (ECF No. 120 at 5–6; ECF No. 120-30.)  The Court determined that, when drawing all reasonable inferences in favor of Plaintiffs, there were sufficient triable issues for Plaintiffs' disparate treatment claim.  (ECF No. 167 at 33–36.)

Trial on Plaintiffs' remaining claims took place from December 3–7, 2018. (ECF Nos. 211, 212, 213, 215, 227.)  During the course of trial proceedings and after Plaintiffs' case-in-chief, Defendants filed a written Rule 50(a) motion for judgment as a matter of law.  (ECF No. 210).  Before submission of the case to the jury, Defendants referred to their filed motion and orally argued to the Court that Plaintiffs had not met their burden to show disparate treatment on the basis of disability and thus judgment as a matter of law was appropriate.  (Trial Tr. Vol. 2B at 224:3–4; ECF No. 213, Trial Transcript Vol. 3 ("Trial Tr. Vol. 3") at 284:11–14.)[5]  The Court denied the Rule 50(a) motion, remarking that, "I think the evidence is pretty thin, but I think at this point, if Ms. Brown is to be believed, a reasonable juror could find there was disparate treatment."  (Trial Tr. Vol. 3 at 284:11–14.)  A day later, the Court declared a mistrial after the jury deadlocked.  (ECF No. 215, Trial Transcript Vol. 4 ("Trial Tr. Vol. 4") at 395:5–7, 395:23–24; ECF No. 216.)  The foreperson reported that the

---

[5] Defendants also contended in their trial remarks to the Court that they had established at summary judgment that a stray remark does not constitute discrimination.  Contrary to Defendants' argument, Defendants' summary judgment motion was silent on oral statements Castanon made to Plaintiffs.  (*See* ECF No. 92.)  Even after Plaintiffs expressly pointed to their Section 3604(c) claims in opposing summary judgment, Defendants failed to address the potential merits of the claims in their reply, and instead argued that such claims were not pleaded despite the FAC's express references to statements Castanon allegedly made.  (ECF No. 124; *see also* ECF No. 4.)

jury's last vote was 6-1 in favor of Defendants. (Trial Tr. Vol. 4 at 395:25–396:6.)

Twenty-eight days after the Court discharged the jury, Defendants timely filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b). Fed. R. Civ. P. 50(b); (ECF No. 221). The Court now turns to the motion's merits.

## LEGAL STANDARD

"A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion," but rather is "a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Thus, a party may only renew a Rule 50 motion if the party previously moved for judgment as a matter of law pursuant to Rule 50(a) before submission of the case to the jury. *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082–83 (9th Cir. 2009). And only when a court has deferred ruling or denied such a motion may a party renew its request for a directed verdict pursuant to Rule 50(b). *E.E.O.C.*, 581 F.3d at 961; *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). Defendants have satisfied these procedural requirements.

Rule 50(a) permits a federal court to direct entry of judgment as a matter of law when after "a party has been fully heard on an issue" "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The court must enter a directed verdict when "there is no substantial evidence to support the claim." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 677 (9th Cir. 1975) (quoting *Cleary v. Nat'l Distillers & Chem. Corp.*, 505 F.2d 695, 696 (9th Cir. 1974)); *Eko Brands, LLC v. Adrian Rivera Maynez Enters.*, 325 F. Supp. 3d 1116, 1118 (W.D. Wash. 2018); *Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1193 (W.D. Wash. 2018).

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000) (citation omitted). The court "draw[s] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* A court may grant a motion for judgment as a matter of law after submitting the matter to the jury if the court finds that "'the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion[.]'" *Escriba v. Foster Poultry Farms, Inc*., 743 F.3d 1236, 1242 (9th Cir. 2014) (internal punctuation and citation omitted). "The district court judge must ask [her]self not whether [s]he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Headwaters Forest Defense v. Cty. of Humboldt*, 240 F.3d 1185, 1197 (9th Cir. 2000), *vacated on other grounds by*, 534 U.S. 801 (2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). Like summary judgment, the mere existence of some alleged factual dispute between the parties or a "scintilla of evidence" will not defeat a properly supported motion for a directed verdict. *Anderson*, 477 U.S. at 247–48; *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 593 (1986); *Thomas*, 289 F. Supp. 3d at 1194.

Unlike in the context of a pre-trial Rule 56 motion for summary judgment, "the prudential reluctance to grant summary judgment—a complete deprivation of a trial—may be relaxed in th[e Rule 50] context because the parties have had their day in court." *Thomas*, 289 F. Supp. 3d at 1194 (citing *Santa Clara Valley Distrib. Co. Inc. v. Pabst Brewing Co*., 556 F.2d 942, 944 n.1 (9th Cir. 1977)). And the fact that the court previously denied summary judgment does not preclude the same court from considering and ultimately granting a Rule 50 motion. *See Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) (noting that both the Fifth and Eleventh Circuits

permit consideration of a Rule 50 motion after the denial of summary judgment); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 n.1 (2d. Cir. 1999) (Sotomayor, J.) ("Although a denial of summary judgment pursuant to [Rule] 56 indicates that genuine material issues remain for the factfinder to resolve[,] a court is free to conclude that the record amassed at trial has eliminated all such issues and thus made judgment as a matter of law appropriate."); *Gross v. S. Ry. Co.*, 446 F.2d 1057, 1060 (5th Cir. 1971) ("It is settled in this Circuit [] that prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict."); *Robbins v. Milner Enterprises. Inc.*, 278 F.2d 492, 497 (5th Cir. 1960) ("[A]t times the issues may be such that only after the agony of a full-blown trial may it authoritatively be determined that there was never really the decisive issue of fact at all."); *Cooper v. Wal-Mart Transp., LLC*, No. H-08-0085, 2010 WL 2522625, at *6 (S.D. Tex. June 18, 2010); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1322 n.1 (S.D. Fla. 2006).

Nor does the fact that the jury was unable to reach a verdict based on the facts presented at trial preclude granting a proper motion for judgment as a matter of law. *Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010); *Headwaters Forest Defense,* 240 F.3d at 1197; *DeMaine v. BankOne*, 904 F.2d 219, 221 (4th Cir. 1990); *see also* 9B Fed. Prac. & Proc. Civ. § 2537 Renewed Motion for Judgment as a Matter of Law, Charles Alan Wright & Arthur R. Miller (3d ed.) ("Notwithstanding the jury's failure to reach a verdict, if the standard for granting a motion for judgment as a matter of law is met, a renewed motion for judgment as a matter of law under Rule 50(b) is appropriate and may be granted.").

## DISCUSSION

As the Court has outlined, Plaintiffs' remaining claims for trial included: (1) discriminatory statements claims pursuant to Section 3604(c) of the FHA and the

related FEHA Section 12955(c) provision, (2) disability disparate treatment claims pursuant to Section 3604(f)(2) of the FHA and the related FEHA Section 12955(a) provision, and (3) an Unruh Act claim.  (ECF No. 178 (Final Pre-Trial Order).)  Defendants move for judgment as a matter of law on each in their renewed motion. (ECF No. 221.)

As a preliminary matter, Rule 50(a) requires that a motion for judgment as matter of law "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).  The purpose of this Rule is "to call the claimed deficiency in the evidence to the attention of the court and to opposing counsel at a time when the opposing party is still in a position to correct the deficit."  *Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996) (citation omitted). The factual and legal grounds raised in Defendants' Rule 50(b) motion mirror those raised in their Rule 50(a) motion.  (*Compare* ECF No. 210-1 *with* ECF No. 221-1.) Plaintiffs do not dispute that Defendants' Rule 50(b) arguments were sufficiently stated in Defendants' earlier Rule 50(a) motion.  (ECF No. 224 at 9–10).  Thus, Plaintiffs have waived any arguments to that effect.  *See Cox v. Freeman*, 321 F.2d 887, 891 (8th Cir. 1963) ("[A]n adverse party who does not object at trial to his opponent's failure to state a specific grounds for a motion for a directed verdict will not be heard to complain of this lack of specificity" later on).  The Court considers each set of Plaintiffs' trial claims.

## A.    Section 3604(c) Discriminatory Statements Claims[6]

The FHA makes it unlawful "[t]o make . . . or cause to be made . . . any . . .

---

[6] The Court limits its written analysis to Plaintiffs' FHA claims because the disposition of those claims applies equally to Plaintiffs' FEHA claims.  *See Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1248 (E.D. Cal. 2009) ("California courts rely on federal housing discrimination law to interpret analogous provisions of FEHA . . . Therefore, violations of the [FHA] will also constitute violations of the parallel provisions of FEHA."); *S. Cal. Hous. Rights Ctr. v. Ass'n & Los Feliz Towers Homeowners Ass'n Bd. of Dirs.*, 426 F. Supp. 2d 1061, 1068 (C.D. Cal. 2005)

statement . . . with respect to the . . . rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). Section 3604(c) applies to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling. 24 C.F.R. § 100.75(b); *Stewart v. Furton*, 774 F.2d 706, 707–08, 710 (6th Cir. 1985). Section 3604(c) protects not only prospective tenants, but existing ones as well. *Hous. Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1193 (C.D. Cal. 2004) (citing *Hous. Rights Ctr. v. Sterling*, 274 F. Supp. 2d 1129, 1142 (C.D. Cal. 2003)).

To prove a Section 3604(c) violation based on an alleged statement, a plaintiff must present evidence that (1) the defendant made the statement; (2) the statement was made with respect to the rental of a dwelling; and (3) the statement indicated a preference, limitation, or discrimination on a prohibited basis. *White v. HUD*, 475 F.3d 898, 904 (7th Cir. 2007). Section 3604(c) claims are not analyzed pursuant to a burden-shifting framework and do not require any showing of intent to discriminate. *Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1245 (E.D. Cal. 2009); *Fair Hous. Congress v. Weber*, 993 F. Supp. 1286, 1290 (C.D. Cal. 1997). The principal focus of Defendants' Rule 50 motion is whether Castanon's alleged statements indicated a preference, limitation, or discrimination on the basis of disability.

"[O]penly discriminatory oral statements" are plainly covered by Section 3604(c). *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999) (statement at issue in case was "[t]he owners don't want to rent to Blacks."). The Ninth Circuit has not expressly addressed the appropriate standard for assessing whether and how a

---

("[A]nalysis under FEHA mirrors the analysis under the federal Fair Housing Act."). The parties agree that violations of FHA constitute violations of parallel provisions in FEHA and accordingly limit their own arguments. (ECF No. 221; ECF No. 224.)

statement that is not openly discriminatory violates Section 3604(c).  Several circuits, however, have adopted the "ordinary reader or listener" standard as a general means to assess Section 3604(c) claims.  *See Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 52 (2d Cir. 2015) (applying the ordinary listener standard in the disability discrimination context); *Jancik v. Dep't of Hous. & Urban Dev.*, 44 F.3d 553, 556 (7th Cir. 1995) ("[E]very circuit that has considered a claim under section 3604(c) has held that an objective 'ordinary reader' standard should be applied in determining what is 'indicated' by [a notice, statement, or advertisement]."); *Ragin v. New York Times Co.*, 923 F.2d 995, 999–1000 (2d Cir. 1991), *cert. denied,* 502 U.S. 821 (1991) (applying the standard in the context of racial discrimination); *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972), *cert. denied*, 409 U.S. 934 (1972).  "The ordinary reader [or listener] 'is neither the most suspicious nor the most insensitive of our citizenry.'"  *Soules v. HUD*, 967 F.2d 817, 824 (2d Cir. 1992) (quoting *Ragin*, 923 F.2d at 1002).

District courts in the Ninth Circuit have looked to these decisions and similarly applied an ordinary reader or listener standard to assess Section 3604(c) claims.  *See Iniestra v. Cliff Warren Invs., Inc.*, 886 F. Supp. 2d 1161, 1169 (CD. Cal. 2012); *Pack*, 689 F. Supp. 2d at 1245 (applying "ordinary reader or listener" standard); *Hous. Rights Ctr.*, 404 F. Supp. 2d at 1193; *Llanos v. Estate of Coehlo*, 24 F. Supp. 2d 1052, 1057 (E.D. Cal. 1998); *Fair Hous. Congress*, 993 F. Supp. at 1290.  Both sides apply this ordinary listener standard to argue about the legal sufficiency of Plaintiffs' evidence.  (ECF No. 221-1 at 11–18; ECF No. 224 at 3–6.)  Accordingly, the Court considers whether there is a legally sufficient evidentiary basis to support Plaintiffs' Section 3604(c) claims based on the two statements Plaintiffs proffer in view of the ordinary listener standard.[7]

_____

[7] The Court has never assessed Plaintiffs' Section 3604(c) claims based on these statements. The Court's summary judgment order expressly noted that Defendants failed to move for summary

### 1.     Designated Fire Lane Parking Statement

The first statement Plaintiffs proffer is one Castanon made when Brown parked in the designated fire lane located in front of her mother's Civita apartment.  Plaintiffs initially alleged that around May 26, 2015, Elliott was hospitalized after she fell at the property.  (FAC ¶ 28.)  When Brown drove Elliott home after Elliott's release from the hospital, Brown "parked at the curb next to Ms. Elliott's apartment," which was "not painted red" and lacked "any signs indicating that parking was prohibited in the area." (*Id*. ¶ 29.)  Brown allegedly "began assisting [Elliott] to get out of the vehicle," but "when . . . Castanon [] saw Ms. Elliott trying to get out of the vehicle, Ms. Castanon stated that there was no parking in that area and forbid her from getting out of the vehicle at the curb." (*Id*.)  When Brown told Castanon that Elliott "was just returning from the hospital, and asked if she could be [sic] let her mother out at the curb," "Castanon refused to make an accommodation." (*Id*.)  Brown's declaration in opposition to summary judgment recounted a similar series of events.[8]

---

judgment on Plaintiffs' Section 3604(c) claims regarding these statements.  (ECF No. 167 at 38 ("Although Defendants purport to move for summary judgment on all FHA claims, they have noticeably failed to address Section 3604(c) claims and, therefore, have failed to meet their burden to show that they are entitled to summary judgment.").)  Thus, the Court's present assessment is its first merits assessment of the claims.

[8] Specifically, Brown submitted a declaration which stated that:

> [W]hen Ms. Castanon saw my mother trying to get out of the car, Ms. Castanon shouted there was no parking in that area and forbid my mother from getting out of the car at the curb.  Ms. Castanon insisted that my mother and I park in the parking lot, which was a significant distance from my  apartment, and in which we had not been authorized to park.  As such, I said to Ms. Castanon that my mother was just returning from the hospital, and I asked if I simply could let my mother out at the curb.  Ms. Castanon coldly refused to permit me to do so.

(ECF No. 120-30, Linda Brown Decl. ¶ 10.)  Brown also declared that "whenever I attempted to park at the curb next to my mother's apartment to transport her to or from the apartment to the doctor . . . . Castanon repeatedly told me that she did not care my mother had a disability, and she was unwilling to make any accommodations in parking due to my mother's disability." (*Id*. ¶ 12.) There are stark factual differences between this summary judgment record and the trial record for

– 16 –

1

2    At trial, Brown testified that in late May 2015, she parked in the curb area on

3    the day when she brought her mother home from the hospital. (Trial Tr. Vol. 1 at

4    60:3–25, 61:5–7.) Castanon was outside and told Brown that "[she] couldn't park

5    there" or "I'll have you towed." (*Id*. at 61:3–7; 62:8–9, 62:13–15.) Brown tried to

6    explain that she was trying to quickly retrieve some things from Elliott's apartment

7    following Elliott's hospital stay, but Castanon "just said she didn't care about my

8    mom's disability or hospital stay." (*Id*. at 62:13–18.) Brown told Castanon "go ahead

9    and tow me," left her car parked at the curb with her mother inside the car, and

10   retrieved several items from Elliott's apartment. (*Id*. at 62:10–12, 63:11–16, 63:21–

11   23.)

12

13   Plaintiffs' claim comes down to whether Defendants violated Section 3604(c)

14   when Castanon told Brown that she "didn't care" about Elliott's disability or hospital

15   stay after Brown tried to explain why her car should remain in the designated fire

16   lane. In assessing Plaintiffs' claim, "[t]he 'touchstone' of the inquiry is the message

17   conveyed." *Rodriguez*, 788 F.3d at 53 (quoting *Ragin I*, 923 F.2d at 1000). "[A]

18   statement, even when targeted at a non-disabled individual, can still violate

19   subsection 3604(c)—as long as it conveys, to the ordinary listener, a preference

20   against those who are disabled as defined by the FHA." *Id*. at 53. A court asks (1)

21   whether an ordinary listener would understand the speaker's statement to be based

22   on disability, even if the speaker does not target a specific individual and, if so, (2)

23   whether an ordinary listener would understand the speaker to be expressing a

24   preference, limitation, or discrimination on the basis of disability. *Id*. at 52; *see also,*

25   *e.g.*, *Avakina v. Chandler Apts., LLC*, No. 6:13-cv-1776-MC, 2015 WL 413813, at

26   *5 (D. Or. Jan. 30, 2015) (finding "no question" that housing owner's statement that

27

28   Plaintiffs' Section 3604(c) claim as well as their Section 3604(f)(2) claim, which in part relies on
     the statements Castanon made when Brown parked in the designated fire lane.

pets were not permitted were discrimination based on handicap in violation of Section 3604(c) when preceding statements "put [defendant] on notice that the testers were requesting reasonable accommodations for their assistance animals). Actions prohibited under Section 3604(c) include using words or phrases which convey that dwellings are not available to a particular group of persons because of a handicap and other expressions that "indicate" a preference or a limitation on any renter because of handicap. 42 U.S.C. § 3604(c); *see White*, 475 F.3d at 906.

A reasonable jury would not have a legally sufficient evidentiary basis in the trial record to find that Castanon's statement violates Section 3604(c). Castanon's first remark to Brown was that parking was not permitted in the curb area. This remark did not draw any distinction based on disability, nor did it express a preference, limitation, or discrimination on the basis of disability.

Only after Brown referenced Elliott's disability and hospital stay as reasons why she should be able to park there did Castanon remark that she "didn't care" about this information. An ordinary listener would hear Castanon's remark that she "didn't care" Elliott had a disability as "based on handicap" because Castanon necessarily acknowledged that Elliott had a disability. But an ordinary listener would not understand Castanon's statement to facially or indirectly *indicate a preference, limitation, or discrimination* about who could park at the curb based on disability *when placed into context. See Soules*, 967 F.2d at 825 ("That statements are not facially discriminatory [] does not mean that they do not indicate an impermissible preference *in the context* in which they were made." (emphasis added)); *Mancuso v. Douglas Elliman, LLC*, 808 F. Supp. 2d 606, 625 (S.D.N.Y. 2011) ("[A]n ordinary listener hears statements in context."); *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 567 (E.D.N.Y. 2007) ("In cases involving 'vague remarks,' context and timing are everything" for assessing a Section 3604(c) claim); *see also Fair Hous. Res. Ctr.,*

*Inc. v. Djm's 4 Reasons, LTD.*, 499 Fed. App'x 414, 416 (6th Cir. 2012) (unpublished) ("When applying the 'ordinary listener' test, context is relevant to assist the factfinder in determining 'the manner in which a statement was made and the way an ordinary listener would have interpreted it.'" (citing *Soules*, 967 F.2d at 825; *Jancik*, 44 F.3d at 556)).

In context that became undisputed in light of the parties' trial stipulation, an ordinary listener would understand that Castanon expressed that it did not matter whether Elliott had a disability or was returning from the hospital because no one was permitted to park in the designated fire lane. The parties stipulated that the curb area in front of Elliott's apartment was a designated fire lane before Elliott ever moved into Civita. Subject to certain exceptions not presented in this case, *no one* is authorized to park in a fire lane *pursuant to California law*. *See* Cal. Veh. Code § 22500.1. Castanon's remark that she did not care about Elliott's disability therefore made no difference to whether Brown could permissibly park in the area. Any "limitation" on parking at the curb in front of Elliott's apartment was not attributable to Castanon, but to this legal prohibition and the curb's designation.

Although Castanon's use of the words "I don't care" may have been an insensitive choice of words, the FHA does not make this insensitivity actionable. Rather, the harm against which Section 3604(c) protects against is "[the] psychic injury caused by discriminatory statements made in connection with the housing market." *United States v. Space Hunters, Inc*., 429 F.3d 416, 424–25 (2d Cir. 2005) (internal quotations and citation omitted) (emphasis added); *Harris*, 183 F.3d at 1055 (discussing merits of Section 3604(c) claim and noting that remark "unrelated to the decisional process" is "insufficient to show discrimination."). The FHA is not a means to police statements that are not discriminatory, even if the statements are insensitive. Based on the trial record, a reasonable jury would not have a legally

sufficient evidentiary basis to find that Castanon's fire lane parking statement violated the FHA.

### 2.    Handicapped Parking Spot Statement

The second statement Plaintiffs proffer is a statement Castanon made when Brown inquired about whether she could get a Civita handicapped parking spot. Plaintiffs alleged that "Ms. Castanon informed Ms. Brown that her mother's car could not be parked in the handicap space located at the apartment complex unless Ms. Elliott was the one who was driving the vehicle." (FAC ¶ 22.) At trial, Brown testified that when she asked Castanon about the possibility of using a handicapped parking spot, Castanon stated "you can't have one because your mom isn't driving." (Trial Tr. 1 at 71:23–72:2.) In response, Brown explained that "my mom has a disability, and I will need the spot to take my mom back and forth to doctor's appointments, etc., and we need a parking spot, so I would really like to have a handicap spot for my mom." (*Id.* at 72:3–7.) Castanon "didn't care" and responded "she's no need for a parking spot." (*Id.* at 72:8–12.)

An ordinary listener would understand Castanon's statement as "based on handicap" because she responded to a question about handicapped parking spaces. But an ordinary listener would not understand the statement *to indicate a preference, limitation, or discrimination* on the basis of disability with respect to who could park in Civita's handicapped parking spots.

Context shows that Castanon's statement initially concerned whether Elliott was the individual driving and subsequently whether Elliott had a "need" for a handicapped parking spot. Castanon's initial statement that Elliott could not use a spot unless she was the one driving may have been a misstatement regarding who may use a handicapped parking placard. *See* Cal. Veh. Code § 4461 ("A person to

whom a disabled person placard has been issued may permit another person to use the placard only while in the presence or reasonable proximity of the disabled person for the purpose of transporting the disabled person."). Such a misstatement, however, does not show that Castanon's statement was facially discriminatory or that Castanon made her statement with the intention to discriminate on the basis of disability in violation of Section 3604(c). *See Mancuso*, 808 F. Supp. 2d at 628 (concluding that "[a] broker's statement that an owner can 'do what he wants,' even if an incorrect statement of the law, does not necessarily lead to the inference that the owner has an unlawful discriminatory preference.").

Castanon's further remark regarding Elliott's "need" for a handicapped parking spot dispels the notion that she communicated a preference, limitation, or discrimination on the basis of disability. California law regulates the issuance of handicapped parking placards to individuals who have certain covered disabilities. *See* Cal. Veh. Code §§ 295.5, 5007, 22511.55.[9] California law in turns authorizes only persons "*to whom a disabled person placard has been issued*" to permit another person to use the placard in certain circumstances. *See* Cal. Veh. Code § 4461 (emphasis added). Neither Elliott, nor Brown had a handicapped parking placard at the time Brown inquired about the possibility of using a Civita handicapped parking spot. Brown understood that parking in Civita's handicapped parking spots was not the same as parking elsewhere at Civita because Brown expressly asked Castanon about the possibility of using a spot. Even after Castanon made the challenged statement to Brown, Brown sought to persuade Castanon to permit her to park in a handicapped parking spot by providing a copy of a completed, but not approved

---

[9] California law does not permit persons with any disability to obtain a handicapped parking placard. Rather, the Vehicle Code expressly defines disability to cover only certain types of disability, which informs who can apply for a "special license plate" on the basis of disability. *See* Cal. Veh. Code §§ 295.5, 5007, 22511.55. It does not appear that Elliott's disability of Alzheimer's would have qualified her for a handicapped parking placard.

DMV application.  Much like Brown's own conduct reveals, an ordinary listener would not understand Castanon's statement to have expressed a preference, limitation, or discrimination regarding who could park in a Civita handicapped parking spot on the basis of disability.

*    *    *

In sum, a reasonable jury would not have a legally sufficient evidentiary basis to find for Plaintiffs on their Section 3604(c) claims.  Defendants are entitled to judgment as a matter of law.

## B.      Section 3604(f)(2) Disparate Treatment Claim

The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap," of "that person[.]"  42 U.S.C. § 3604(f)(2)(A).  This provision guarantees tenants with a disability a "right to equal treatment once they have become residents" of an apartment. *Comm. Concerning Cmtg. Improvement v. City of Modesto,* 583 F.3d 690, 713 (9th Cir. 2009).  A discrimination claim raised pursuant to this provision requires a disability within the meaning of the FHA.  42 U.S.C. § 3602(h) (to show a "handicap," a plaintiff must show: (1) "a physical or mental impairment which substantially limits one or more . . . major life activities;" (2) "a record of having such an impairment;" or (3) that she is "regarded as having such an impairment").  Defendants concede that Elliott had a disability with the meaning of the FHA based on her Alzheimer's.  Defendants' fundamental contention is that Plaintiffs failed to provide sufficient evidence of discrimination "because of a handicap."

Courts have recognized three distinct types of FHA discrimination claims: (1) disparate treatment, (2) disparate impact, and (3) failure to make reasonable accommodations. *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev.,*

620 F.3d 62, 66 (1st Cir. 2010); *Reg'l Econ. Cmty. Action Prog., Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996). As a result of the Court's summary judgment order, Plaintiffs' Section 3604(f)(2) trial claim concerned disparate treatment in Brown parking at the curb in front of Elliott's apartment.

### 1.    Disparate Treatment Legal Framework

At the summary judgment stage[10], FHA disparate treatment claims are generally analyzed pursuant to the three-step framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), for Title VII employment discrimination claims. *Gamble v. City of Escondido*, 104 F.3d 300, 304–05 (9th Cir. 1997). Pursuant to this framework, a plaintiff bears the initial burden to establish a *prima facie* case of discrimination. In the Ninth Circuit, a *prima facie* FHA case requires a showing that the "(1) plaintiff's rights are protected under the FHA; and (2) as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury." *Harris*, 183 F.3d at 1051; *Inland Mediation Bd. v. City of Pomona,* 158 F. Supp. 2d 1120, 1148 (C.D. Cal. 2001) (plaintiffs must show first that they were subjected to different "terms, conditions or privileges because of a protected status"). A plaintiff "can establish a *prima facie* case by showing that animus against the protected group"—here, individuals with disabilities—"was a significant factor in the position taken" by the defendant. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995).

If the plaintiff meets her initial burden, then the burden shifts to the defendant

---

[10] Because a Rule 50 analysis "mirrors" the summary judgment standard, *Reeves*, 530 U.S. at 150, it is appropriate to apply summary judgment frameworks to the trial evidence on Plaintiffs' disparate treatment claim to assess whether the evidence is legally sufficient.

to set forth a legitimate, non-discriminatory reason for its conduct. *Harris*, 183 F.3d at 1051. This showing requires only that the defendant set forth a legally sufficient explanation for the allegedly discriminatory conduct. *Hous. Rights Ctr.*, 404 F. Supp. 2d at 1190. If the defendant sets forth such a reason, then the burden shifts to plaintiff to prove by a preponderance of the evidence that the defendant's proffered reason is pretext for discrimination. *Harris*, 183 F.3d at 1051. A plaintiff may establish pretext either directly, by proving that a discriminatory purpose "more likely motivated" the defendant, or indirectly, "by showing that the defendant's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256; *Harris*, 183 F.3d at 1043; *Gamble*, 104 F.3d at 305. The plaintiff need not always introduce additional evidence, but rather, in some cases, may be able to show pretext by relying on the same evidence she offers in support of her *prima facie* case. *Burdine*, 450 U.S. at 256.

Although the *McDonnell Douglas* framework is a hallmark of judicial analysis of disparate treatment claims at the summary judgment stage, it is not the sole means by which a plaintiff may show disparate treatment. "Instead of *McDonnell Douglas*," a plaintiff may survive summary judgment *by using* "the 'sensitive' multi-factor inquiry articulated . . . in *Arlington Heights v. Metropolitan Housing Corp*., 429 U.S. 252, 266 (1977), to . . . create[] a triable issue of fact that the defendant's actions were motivated by discriminatory intent." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (Reinhardt, J.) (citing *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 550 (9th Cir. 1982)) (emphasis added). Pursuant to the *Arlington Heights* factors, a court assesses whether a discriminatory purpose motivated the defendant's challenged actions by examining: (1) statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant "legislative or

administrative history." 429 U.S. at 266–68; *Comm. Concerning Cmty. Improvement*, 583 F.3d at 703 (applying the *Arlington Heights* factors).

Regardless of the means used, "[p]roof of discriminatory motive is crucial to a disparate treatment claim." *Gamble*, 104 F.3d at 305 (citing *Familystyle of St. Paul, Inc. v. City of St. Paul*, 728 F. Supp. 1396, 1401 (D. Minn. 1990), *aff'd by*, 923 F.2d 91 (8th Cir. 1991)). Thus, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotations and citation omitted). Moreover, an intent to discriminate is legally meaningless without a "distinct and palpable injury." *Harris*, 183 F.3d at 1051 (*prima facie* case of disparate treatment in violation of FHA requires that "as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury"). Thus, a plaintiff must show that the defendant's disparate treatment caused "adverse effects" to the plaintiff. *See Pac. Shores Props., LLC*, 730 F.3d at 1164.

### 2.    Plaintiffs' Disparate Treatment Claim

Plaintiffs' disparate treatment claims center on Castanon's refusal to permit Brown to park her car at the curb located in front of Elliott's apartment. Relying on the *McDonnell Douglas* burden-shifting framework in their Rule 50 motion, Defendants argue that Plaintiffs have failed to provide legally sufficient evidence on which a reasonable jury would find for Plaintiffs.[11] (ECF No. 221-1 at 8–11; *see also*

---

[11] Defendants' summary judgment motion did not cite the *McDonnell Douglas* burden-shifting framework. (*See* ECF No. 92-1.) Although Defendants acknowledged that "FHA claims are evaluated under the burden-shifting framework of the Title VII discrimination analysis," Defendants did not actually funnel Plaintiffs' allegations of disparate treatment through the framework. (*See id.* at 16–17.) Instead, Defendants recounted the summary judgment facts regarding Brown's parking in a designated fire lane separately from their legal analysis. (*Compare id.* (legal argument regarding FHA) *with id.* at 6–7 (setting forth factual averments regarding fire

ECF No. 210-1 at 6–8 (Rule 50(a) motion filed before submission of case to the jury).) Plaintiffs therefore had notice that Defendants would rely on *McDonnell Douglas* as the basis for the Court's assessment of the legal sufficiency of the trial evidence. Nevertheless, Plaintiffs' opposition to Defendants' Rule 50(b) motion does not address the legal sufficiency of the trial evidence based on the burden-shifting framework and omits any reference to *McDonnell Douglas*. (*See* ECF No. 224 at 6–8.)

Although Plaintiffs aver that the trial evidence is legally sufficient for a jury to find for them, Plaintiffs do not refer to any other framework to assess their disparate treatment claim. Tellingly, despite citing *Pacific Shores*, Plaintiffs do not refer to its application of the *Arlington Heights* multi-factor test or even apply the test as a means for the Court to assess their FHA disparate treatment claim. By failing to rely on the *Arlington Heights* factors to oppose Defendants' Rule 50 motion, the Court deems waived any argument based on the factors. *See Pac. Shores Props., LLC*, 730 F.3d at 1159 (noting that it is the plaintiff who "opts to rely on the *Arlington Heights* factors to demonstrate discriminatory intent"). Accordingly, the Court applies the *McDonnell Douglas* framework to assess the legal sufficiency of the trial evidence.

### a.    The Absence of a *Prima Facie* Showing

Plaintiffs' claims of disparate treatment regarding parking at the curb in front

---

lane parking).) The Court thus clarifies that Defendants' summary judgment arguments were too undeveloped to warrant summary judgment on Plaintiffs' disparate treatment claim. *See Hibbs v. Dep't of Hum. Resources*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (argument "too undeveloped to be capable of assessment"); *Wells Fargo Bank, N.A. v. Renz*, 795 F. Supp. 2d 898, 911 (N.D. Cal. 2011) (denying defendants' request for summary judgment on claims for which defendants "offer a string citation to various cases and California civil jury instructions, without providing any explanation or analysis of how these authorities support their position."); *In Re Katz Interactive Call Processing Patent Litig.*, 883 F. Supp. 2d 935, 948 n.1 (C.D. Cal. 2010) (denying summary judgment because "the argument was so undeveloped that this Court can only reject the argument for failure to satisfy [movant's] burden").

of Elliott's apartment arise in part from Castanon telling Brown that she was not allowed to park there, and if Castanon caught Brown parking there, Castanon would have Brown's car towed. (Trial Tr. Vol. 1 at 49:6–13.) Plaintiffs' disparate treatment claim, however, is not premised on the mere fact of this statement. Rather, Plaintiffs ground their disparate treatment claim in "differences in treatment" regarding who could park in the designated fire lane. (ECF No. 224 at 8.) In support, Brown testified that "other people"—"quite a few"—parked there. (Trial Tr. Vol. 1 at 47:20–24, 48:15–18.) Brown further testified that, at some point, she had seen cars parked there overnight and moving vans parked there. (*Id*. at 49:2–5.) Brown stated that Castanon "didn't say anything to the other people, just me[.]" (*Id*. at 50:1–3.)

This trial record fails to make a *prima facie* showing of disparate treatment generally or with respect to disability. Brown's vague references to "other people" is a plainly insufficient basis from which a reasonable jury would find that there were differences in treatment. Plaintiffs failed to provide any evidence regarding who these other individuals were, including whether any individuals had a disability or not and, critically, whether any individuals who parked at the curb were actually Civita residents. Plaintiffs also did not provide evidence that Castanon possessed the authority to grant permission to any individual to park at the curb, let alone that she purported to grant such permission to any non-disabled individual. *See Brooks v. Seattle Hous. Auth.*, No. C12-0878-JCC, 2015 WL 3407415, at *3 (W.D. Wash. May 26, 2015) (plaintiff failed to make *prima facie* case when she did not produce evidence that similarly situated individuals outside her protected class was treated differently and her speculation about better treatment of such individuals was insufficient); *Grundy v. JPMorgan Chase Bank*, No. CV-10-1542-PHX-DGC, 2012 WL 3028341, at *2 (D. Ariz. July 24, 2012) (plaintiffs failed to make *prima facie* case for FHA claim when they provided no evidence that similarly situated individuals outside protected class were treated differently); *Collins v. Chesapeake*

*Commons Holdings, LLC*, No. CIV S-09-1816 FCD EFB PS, 2011 WL 2580360, at *4–5 (E.D. Cal. June 28, 2011) (same). In the absence of such evidence, a reasonable jury would lack a legally sufficient evidentiary basis to conclude that Castanon treated Plaintiffs differently than other Civita residents, let alone on the basis of Elliott's disability.

### b. Legitimate, Non-Discriminatory Reason and Absence of Pretext

Even assuming *arguendo* that Plaintiffs made a *prima facie* showing, Defendants offered a legitimate, non-discriminatory reason for why Brown could not park at the curb in front of Elliott's apartment: the area was a designated fire lane. Crucially, during trial, the parties stipulated that the Civita site plans indicated that this area was designated as a fire access lane. (Trial Tr. Vol. 2B at 225:5–8.) Trial evidence further showed that the City of San Diego required a fire access lane before the City would provide approval for Civita's construction. (*Id.* at 230:23–231:4.) Subject to certain exceptions not presented in this case, *no one* is authorized to park in a fire lane *pursuant to California law*. *See* Cal. Veh. Code § 22500.1. The designation of the curb as a fire lane thus qualifies as a legitimate, non-discriminatory reason for Castanon telling Brown that Brown could not park in the area. *See Idaho Aids Found., Inc. v. Idaho Hous. & Fin. Ass'n*, 422 F. Supp. 2d 1193, 1203 (D. Idaho 2006) (compliance with legal requirements qualifies as a "clearly legitimate and nondiscriminatory" reason).

Plaintiffs presented no legally sufficient evidence that the proffered reason was pretext for discrimination on the basis of disability. Although Ms. Brown testified that Castanon was "cold" and "distant" to her and to her mother, there is no trial evidence that this treatment was because of Elliott's disability. Castanon's statement that she "didn't care" about Elliott's disability or hospital stay would not provide a legally sufficient evidentiary basis for pretext. As the Court has already concluded,

the context in which the statement was made makes clear that Castanon merely expressed that it did not matter whether Elliott had a disability or was returning from the hospital because no one was permitted to park in the designated fire lane. And although Plaintiffs point to the placement of "No Parking" signs at Civita, there is no evidence that these signs were directed at Brown or Elliott as means of discriminating on the basis of disability. Brown testified that when she returned to Civita after the May 2015 incident, the curb remained unmarked and there were no signs. When signs were placed up, the signs were placed alongside the entire curb and facially applied to all drivers who might seek to park there. (Trial Tr. Vol. 1 at 65:20–66:5, 67:9–24.) Furthermore, Plaintiffs did not provide evidence of any concrete "adverse effects" from this conduct: Brown left her car parked at the curb with her mother inside and retrieved several items from Elliott's apartment. (*Id.* at 62:10–12, 63:11–16, 63:21–23.) Brown provided no evidence that she was ever towed on the day Castanon told her she could not park at the curb, let alone evidence that she was ever towed for parking at the curb in front of Elliott's apartment or otherwise during Elliott's residence at Civita.

To the extent Plaintiffs argue that Elliott was treated differently because Castanon did not initially assign Elliott a parking spot out of the approximately 122 spots at Civita, there is no evidence that the failure to assign Elliott a spot was because of disability.[12] Defendants set forth a legitimate, non-discriminatory reason for why

---

[12] At summary judgment, the Court dismissed Plaintiffs' claim that Defendants violated Section 3604(f)(3) by failing to provide an assigned parking spot as a "reasonable accommodation." (ECF No. 167 at 26–30.) The Court expressly determined that Plaintiffs failed to show that (1) "an assigned parking [spot] was an accommodation 'necessary to ameliorate the effects of Elliott's disability . . . so that she could enjoy the use of her apartment,'" and, even assuming it was necessary, (2) "Defendants . . . provided a legitimate reason regarding the delay in providing an assigned space: lack of availability," for which (3) "Plaintiffs provide[d] no evidence showing that an assignable parking space was available beforehand." (*Id.* at 27, 29.) Notwithstanding this ruling, Plaintiffs' trial evidence appeared to rely on the fact that Castanon did not assign Elliott a parking spot as evidence of disparate treatment on the basis of disability.

– 29 –

Elliott was not assigned a parking spot. Specifically, in response to a question in Elliott's Civita rental application regarding "Vehicle Type," Brown wrote "N/A," *i.e.*, "not applicable." (Trial Tr. Vol. 2A at 103:6–14.) Castanon testified that because Civita had limited parking spots relative to the number of units at Civita, she assigned parking spots only to those residents who had indicated on their rental applications they did had a car. (*Id.* at 165:20–166:8.) Plaintiffs presented no evidence showing that this reason was false or pretext for discrimination on the basis of disability.

\*     \*     \*

In sum, Plaintiffs' trial evidence would not provide a legally sufficient evidentiary basis from which a reasonable jury would find for them.[13] Accordingly, the Court concludes that Defendants are entitled to judgment as a matter of law on Plaintiffs' Section 3604(f)(2) disparate treatment claim.

## C.     California Unruh Act Claim

Plaintiffs' final trial claim concerned the California Unruh Act. The Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, no matter what their . . . disability . . . [and] are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code. §51(a). "The Unruh Act

---

[13] Although Plaintiffs have not relied on the *Arlington Heights* multi-factor test as an alternative basis on which their disparate treatment claims should survive a Rule 50 motion and thus waived the argument, Plaintiffs' trial evidence is insufficient pursuant to that test as well. Plaintiffs provided no evidence of statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones. The evidence regarding "the historical background of the decision" and "[t]he specific sequence of events leading up to the challenged decision" shows that Castanon told Brown she could not park at the curb before Brown referred to Elliott's disability or hospital stay as a basis for why she should be able to park there. Castanon's failure to assign Elliott a parking spot is attributable to legitimate, non-discriminatory reasons and thus cannot provide historical background from which discriminatory intent may be appropriately inferred. Finally, the trial record was otherwise devoid of evidence that Castanon departed from "normal procedures" with respect to Brown parking in a designated fire lane.

was enacted to 'create and preserve a nondiscriminatory environment in California business establishments by 'banishing' or 'eradicating'' arbitrary, invidious discrimination by such establishments.'" *Flowers v. Prasad*, 190 Cal. Rptr. 3d 33, 37 (Cal. Ct. App. 2015).

When a disability-based Unruh Act claim is brought independently of an ADA claim, such as in this case, a plaintiff must show intentional discrimination. *See Munson v. Del Taco, Inc.*, 208 P.3d 623, 627; *see also Greater L.A. Agency of Deafness, Inc., v. Cable News Network, Inc.,* 742 F.3d 414, 425 (9th Cir. 2014). A plaintiff must establish that: "(1) [s]he was denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment; (2) [her] disability was a motivating factor for this denial; (3) defendants denied plaintiff the full and equal accommodations, advantages, facilities, privileges or services; and (4) defendants' wrongful conduct caused plaintiff to suffer injury, damage, loss, or harm." *Wilkins-Jones v. Cty. Of Alameda,* 859 F. Supp. 2d 1039, 1048 (N.D. Cal. 2012) (quoting *Johnson v. Beahm,* No. 2:11-cv-0294-MCE-JFM, 2011 WL 5508893, at *4 (E.D. Cal. Nov. 8, 2011) ("[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act").

Plaintiffs premise their Unruh Act claim on the same conduct by which they claim Castanon treated them differently on the basis of disability with respect to Brown parking at the curb in front of Elliott's apartment.[14] The Unruh Act requires a plaintiff to show that a protected characteristic was a "substantial motivating

---

[14] At summary judgment, the Court dismissed Plaintiffs' Unruh Act claims to the extent they concerned Defendants' alleged failure to provide reasonable accommodations with respect to residential housing. (ECF No. 167 at 44–46.) The Court permitted for trial Unruh Act claims solely concerning Defendants' alleged denial of the opportunity to park the curb in front of Elliott's apartment. (*Id.*)

reason" for the defendant's alleged denial of equal accommodations, advantages, facilities, privileges or services. *See* California Civil Jury Instructions ("CACI"), 2 CACI 3060, Unruh Civil Rights Act—Essential Factual Elements (explaining that the "substantial motivating factor" accounts for the possibility of both discriminatory and non-discriminatory motives) (citing *Harris v. City of Santa Monica*, 294 P.3d 49 (Cal. 2013)). For the reasons the Court has discussed, the Court must conclude that a reasonable jury would lack a legally sufficient evidentiary basis to find that Defendants intentionally discriminated on the basis of disability. Plaintiffs presented no evidence of an intentional denial of equal accommodations on the basis of disability with respect to parking at the curb in front of Elliott's apartment, which was a designated fire lane. Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiffs' Unruh Act claim.

## CONCLUSION & ORDER

For the foregoing reasons, the Court concludes that judgment as a matter of law on Plaintiffs' remaining claims is appropriate.[15] The Court accordingly **ORDERS** that:

1. Defendants' motion for judgment as a matter of law pursuant to Rule 50(b) is **GRANTED** in its entirety. (ECF No. 221.) All of Plaintiffs' remaining claims in the FAC (ECF No. 4) are **DISMISSED WITH PREJUDICE**.

2. The Clerk of the Court **SHALL ENTER FINAL JUDGMENT** in favor of Defendants and against Plaintiffs. Pursuant to Rule 58, the Clerk shall set out this

---

[15] Plaintiffs' argument in opposition that Defendants are precluded from moving against Plaintiffs' request for punitive damages because Defendants did not make this argument in their Rule 50(a) motion is moot. (ECF No. 224 at 9–10.) Without viable underlying claims, Plaintiffs have no viable request for punitive damages. *See Sako v. Wells Fargo Bank, N.A.*, No. 14-cv-1034-GPC-JMA, 2015 WL 5022307, at *21 (S.D. Cal. Aug. 21, 2015) (granting summary judgment on request for punitive damages because court granted defendants' motion for summary judgment on the underlying related claims); *Munson v. Splice Commc'ns, Inc.*, No. 12-cv-5089-JCS, 2013 WL 6659454, at *24 (N.D. Cal. Dec.16, 2013) (same).

final judgment in a separate document.

        3.      Upon entry of final judgment, the Clerk of the Court **SHALL CLOSE** this case.

        **IT IS SO ORDERED.**

**DATED: February 1, 2019**

**Hon. Cynthia Bashant**
**United States District Judge**